**In re GLOBAL WASTE COMPANY, Involuntary Debtor.**

**Bankruptcy No. 96–16728.**

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

March 14, 1997.

---

Joel H. Rathbone, Javitch, Block, Eisen & Rathbone, Cleveland, OH, for Debtor.

Larry J. McClatchey, Columbus, OH, for Mid–American Waste Systems of Cuyahoga.

Frederick W. Whatley, Walter & Haverfield, Cleveland, OH, for Boyd T. Riley, Jr.

### *MEMORANDUM OF OPINION AND ORDER*

RANDOLPH BAXTER, Judge.

In this core matter the involuntary Debtor, Global Waste Company (Global) seeks dismissal of the involuntary Chapter 7 petition

filed against it by Mid–American Waste Systems of Ohio, Inc. (MAWS Ohio), Mid–American Waste Systems of Cuyahoga, Inc. (MAWS Cuyahoga), and by Boyd T. Riley, Jr. (Riley) (Collectively, The Petitioning Creditors). Upon the conclusion of a duly noticed hearing, an examination of the evidence adduced, and of the record generally, the following constitutes the Court's findings of fact and conclusions of law.

Pursuant to provisions of Rule 1011(b), Bankr.R., the Debtor seeks dismissal of the within case on the grounds that: (1) It was not commenced by three or more entities, each of which is a holder of a claim against the debtor, that is not contingent as to liability or the subject of a *bona fide* dispute which is in the aggregate amount of more than $10,000.00 than the value of any lien on property of the debtor securing such claims held by the holders of such claims; and, as such, (2) the petition fails to state a claim upon which relief can be granted. In response, the petitioning creditors argue that the requisite number of creditors caused the case to be filed; the underlying claims are not affected by contingencies; and there exists no *bona fide* dispute between the Debtor and the petitioning creditors.

 A resolution of this matter requires the Court to determine whether the instant case meets the requirements for involuntary relief under the bankruptcy Code. In doing so, the initial burden of proving that the requisite number of creditors filed the petition is upon the Debtor who must satisfy its burden by a preponderance of the evidence standard. *In re Coppertone Communications, Inc.*, 96 B.R. 233 (Bankr.W.D.Mo. 1989). Petitioning creditors have the burden of showing that the Debtor has fewer than twelve (12) *bona fide* creditors, once the Debtor files a list of creditors under Rule 1003(b) in support of its motion to dismiss the involuntary petition for lack of creditor support. Debtor's Exhibit 8 sufficiently satisfied the Rule 1003(b) requirement. *Atlas Machine & Iron Works v. Bethlehem Steel*, 986 F.2d 709 (4th Cir.1993); *In re Braten*, 99 B.R. 579 (Bankr.S.D.N.Y.1989).

Under § 303 of the Bankruptcy Code, subsection (b) provides in relevant part:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $10.000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) If there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $10,000 of such claims; 11 U.S.C. 303(b)(1) and (2).

*Required Number Of Creditors*

Three or more petitioning creditors are required to file an involuntary petition against a debtor which has twelve or more claimants. 11 U.S.C. § 303(b)(1). In the matter at bar, the Debtor has clearly demonstrated that there are more than twelve claimants. (Exhibit 8). This finding is unrefuted. That matter being established, the minimum number of petitioning creditors in the present case must be no fewer than three in number.

Although MAWS Ohio and MAWS Cuyahoga have not shown there are fewer than twelve claimants, they argue that this Court should apply a "totality of the circumstances" test to establish that the requisite number of petitioning creditors have filed the present involuntary case and the Debtor is not generally paying its debts.

An examination of the involuntary petition shows the petitioning creditors assert claims totalling $489,833.97, $152,561.54, and $162,000.00, respectively. Petitioning creditors MAWS Cuyahoga and MAWS Ohio are affiliate corporations of Mid–American Waste Systems, Inc., the parent corporation. The Debtor contends that these two petitioning

creditors are not proper petitioners under § 303(b)(1), as no contractual relationship existed between those corporations and the Debtor.

*The Underlying Contracts Between Global And The MAWS Entities*

Debtor Global Waste, Company, Inc., an Ohio general partnership, is a refuse broker. It is engaged in the business of providing for the disposal of municipal solid waste and other waste products under contract with third parties.

On March 15, 1993, Global entered into a brokerage contract with MAWS Cuyahoga, dba Cuyahoga Regional Sanitary Landfill (CRSL). The contract granted Global the right to allow its customers a right of access to the landfill, set a term of three years and tonnage rates, and contained a mutual non-compete provision. On September 1, 1993, Global and CRSL entered into an amended Municipal Solid Waste Disposal Agreement which superseded the March agreement, which also contained a non-compete provision and set different rates per ton, and permitted the disposal of out-of-state wastes. A Special Wastes Addendum was executed by Global and CRSL. The preceding agreements were executed on behalf of CRSL by Timothy Haff, general manager of CRSL.

On March 31, 1995, Global entered into a modification to the prior CRSL Agreements with the parent corporation Mid–American Waste Systems, Inc. (MAWS, Inc.), which superseded the previous agreements. This agreement, *inter alia*, set tonnage rates for waste delivered to the landfill and gave Global the right to have access to the Northern Ohio Waste (NOWS) Transfer & Recycling facility in Oakwood Village, Ohio.[1]

On August 21, 1995, Global entered into a Second Modification to the above-mentioned contracts with MAWS, Inc.. The second modification set rates and tonnage for the CRSL facility, and rates for the NOWS facility, and specified payment mechanisms for certain government fees. Both modifications were executed on behalf of the parent corporation MAWS, Inc.—and not either of the

petitioning creditors. Substantial difficulties subsequently arose regarding the payment term of the contract, rates, and retroactive rate increases which eventually resulted in a cause of action being filed by the Debtor in the state court.

Petitioning creditor Riley, a former shareholder and employee of Global, entered into a non-competition agreement when he left Global. The parties to the non-competition agreement, dated June 6, 1994, were Global and its partners, Can–Am Recycling, Inc. and Ladybird Recycling, Inc.. Monthly payments under the terms of the agreement were made from June, 1994 through approximately April, 1996, when Global alleges Riley breached his contract by engaging in direct competition with his former employer and stopped payment. Global subsequently filed a state court action against Riley. Riley's petitioning creditor status is not specifically challenged by the Debtor.

Global filed for a Chapter 11 reorganization May 31, 1996. Therein, Mid–American Waste Systems, Inc. dba Cuyahoga Regional Sanitary Landfill dba Northern Ohio Waste Systems filed a claim in the Chapter 11 case, as did Riley. Ultimately, the Debtor's Chapter 11 case was voluntarily dismissed.

In summary, the subject refuse disposal contracts were executed between the Debtor and MAWS, Inc. and not the Petitioning Creditors MAWS Ohio or MAWS Cuyahoga. In fact, R. Jay Roberts, the vice-president of MAWS, Inc. signed the modified agreement on behalf of MAWS, Inc. and not on behalf of either of the Petitioning Creditors.

Notwithstanding that the MAWS affiliates are corporate entities (Exhibits A and B), which is uncontested, they were used by MAWS, Inc., the parent, as a conduit with regard to the parent's course of dealings with the Debtor. That is, although Global paid its invoices to MAWS Cuyahoga dba CRSL no contract exists between the Debtor Global and that entity. Indeed the testimony of R. Jay Roberts (Cross–Exam) acknowledges that he has no knowledge of what was dis-

---

1. The modification also increased the maximum allowed tonnage, guaranteed new rates, and re-defined the term of the parties' contract. MAWS Ohio operated the NOWS transfer facility.

closed to Global regarding MAWS, Inc.'s identity, although he intended for MAWS, Inc. (the parent) to sign the modified contracts (Exhibits 3 and 4) on behalf of petitioner MAWS Ohio. He further acknowledged that only one proof of claim was filed by the MAWS organization in Global's prior voluntary Chapter 11 case. Remarkably, the petitioning affiliate corporations of MAWS, Inc. only filed proofs of claim in the instant case on February 24, 1997, during the pendency of this evidentiary hearing. Herein, Roberts testified unequivocally that the parent MAWS, Inc. had control of all funds that were paid by the Debtor, although they were funneled through the subject affiliates. (Roberts, Cross–Exam.).

In summary, the petitioning MAWS affiliates: (1) were merely conduits of the parent MAWS, Inc. which totally controlled all funds channeled through them from the Debtor Global; (2) were in no instance signatories on the underlying modified contracts which were executed by the parent, MAWS, Inc.; (3) no other contracts were in evidence to establish a contractual relationship between them and the Debtor; (4) neither of the petitioning affiliates filed a proof of claim in the Debtor's earlier filed voluntary Chapter 11 case; and (5) only filed a proof of claim in the present case during the pendency of this action. Further, the unrefuted testimony of one of the Debtor's principal's, Carl Guillombardo, revealed that the Debtor maintained separate accounts for the petitioning affiliates only because the parent MAWS, Inc. required the Debtor to do so. (Guillombardo, Re-direct).

■ The petitioning creditors cite the Sixth Circuit's ruling In *Concrete Pumping*, 943 F.2d 627 (6th Cir.1991) for the proposition that a totality of the circumstances test should be applied herein. Their reliance thereon is misplaced. In several respects, *Concrete Pumping* is distinguishable. Unlike the case at bar, *Concrete Pumping* involved a single petitioning creditor case which clearly had fewer than twelve creditors, thereby conforming with § 303(b)(2) of the Code. The present case fails to conform to the requisite number of creditors per § 303(b)(1) and (2). The Sixth Circuit further found that the debtor in *Concrete Pumping* had committed, in whole or in part, fraud, artifice, or a scam against its creditors. Neither of those factors have been established herein. Further the Circuit found that *Concrete* was generally not paying its debts as they became due. No clear showing has been made in this regard in the present case. The burden of proof in this regard is upon the petitioning creditors. Herein that burden has not been met. Indeed, the Debtor's managing director, Kevin C. Parks testified that its listing of trade creditors (Exhibit 5) were generally in a "current" pay status. (Parks, Direct Exam). This testimony was further corroborated by the testimony of the Debtor's co-managing director and general counsel, Carl Guillombardo (Direct Exam). Finally, In *Concrete Pumping*, that Debtor was in default on 100% of its debt to 100% of its creditors. Such has not been evinced in the present case. Thusly, even in applying a "totality of circumstances" test, which actually is unwarranted herein, the Debtor's motion to dismiss is sustainable.

■ In determining whether the requisite number of petitioning creditors have filed the present involuntary case, the Debtor effectively seeks to have the Court apply an alter ego theory or pierce the corporate veil to discern whether a separate legal identity should be disregarded between the parent MAWS, Inc. and its two petitioning affiliates MAWS Ohio and MAWS Cuyahoga. Typically, the corporate veil has been pierced where the owners have misused the corporate form, or have established it for a fraudulent purpose or to commit an illegal act. *Bucyrus–Erie Co. v. General Products Corp.*, 643 F.2d 413 (6th Cir.1981); *accord, Miles v. Kohli, etc.*, 917 F.2d 235 (6th Cir.1990); *Krivo Indus. Sply. Co. v. Nat'l. Distillers & Chem. Corp.*, 483 F.2d 1098, 1102 (5th Cir. 1973). Courts have also pierced the corporate veil where a parent company totally dominates and controls its subsidiary, operating the subsidiary as its business conduit or agent. *See, United States v. Jon–T Chemicals*, 768 F.2d 686, 691 (5th Cir.1985), *cert. denied*, 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986); *In re Gibraltor*, 291 F.2d 22 (2d Cir.1961) *cert. denied*, 368 U.S.

925, 82 S.Ct. 360, 7 L.Ed.2d 190 (1961). Both the alter ego doctrine, and the piercing of the corporate veil are exceptional doctrines, reserved for cases where the officers, directors or stockholders have utilized the corporate entity as a sham to perpetuate a fraud, to shun personal liability, or to encompass other truly unique situations. *See, In re Multiponics,* 622 F.2d 709, 724–25 (5th Cir. 1980). Herein, the Debtor espouses the alter ego theory to thwart the Petitioning Creditors' efforts to place it into an involuntary bankruptcy.

As held In *Bucyrus–Erie, supra,* (6th Cir. 1981), addressing applicable Ohio law:

> The notion of the corporation as a legal entity is a fiction of the law introduced for convenience in conducting business. Under Ohio law, when "urged to an end subversive of its policy", the fiction should be disregarded and the corporation considered as an aggregation of persons, both in equity and at law. *State v. Standard Oil Co.,* 49 Ohio St. 137, 30 N.E. 279 (Sup.Ct. 1892). *Id.* at 418.

The Sixth Circuit further noted, at that particular point in time:

> No precise test for disregarding the corporate fiction has been articulated by the courts, each case being regarded as "sui generis" and decidable on its own facts. [FN4] Nonetheless, certain general principles have been recognized. As recently set forth in *Brunswick Corp. v. Waxman,* 459 F.Supp. 1222 1229 (E.D.N.Y.1978), aff'd 599 F.2d 34 (2d Cir.1979), the corporate fiction should be disregarded when: (1) domination and control over the corporation by those to be held liable is so complete that the corporation has no separate mind, will, or existence of its own; (2) that domination and control was used to commit fraud or wrong or other dishonest or unjust act, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong. *Id.*

The Sixth Circuit further noted that the alter ego doctrine is equitable in nature, with the test of its application being whether recognition of corporateness would produce unjust consequences. *Id.* at 421. In applying such a test to the context of the present case, equity dictates a disregard of the corporate fiction for the purpose of determining whether the required number of petitioning creditors filed the subject involuntary case against the Debtor. As stated above, the evidence clearly demonstrates that: (1) the parent, MAWS, Inc. operationally controlled the petitioning affiliate corporations (Testimony, R. Jay Roberts); (2) the invoices paid by the Debtor to MAWS, Inc. affiliates were directly funneled to the coffers of MAWS, Inc., rather than being retained by the petitioning affiliates; (3) in the Debtor's prior voluntary Chapter 11 case, only MAWS, Inc. (the parent) filed a proof of claim against the Debtor's bankruptcy estate (Debtor's Exhibit G) and not the petitioning creditor affiliates of MAWS, Inc. Indeed, MAWS, Inc.'s proof of claim filed in the Debtor's chapter 11 case referred to both of the subject petitioning affiliates as "dba's". Such characterization of the affiliates convincingly demonstrates the domineering role the parent corporation, MAWS, Inc., displayed with regard to its relationship with its subject petitioning affiliates; and (4) lastly, only during the pendency of the within adversary proceeding, once this issue was in play, did the two petitioning affiliates of MAWS, Inc. cause proofs of claims to be filed in the Debtor's involuntary case. Thusly, the petitioning creditors MAWS Ohio and MAWS Cuyahoga were nothing more than alter egos of their parent, MAWS, Inc., which was not one of the petitioning creditors.

### Conclusion

Accordingly, pursuant to § 303(b), an insufficient number of petitioning creditors caused the filing of the above-styled involuntary Chapter 7 case against the Debtor. The Debtor's Motion to Dismiss is meritorious and is hereby granted. Costs are awarded to the Debtor.

IT IS SO ORDERED.