**In re Jan McLendon MOSS,**
**Alleged Debtor.**

No. 00–30934–BJH–7.

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

May 15, 2000.

---

Michael D. Warner, Seymour Roberts, Jr., Simon, Warner & Doby, L.L.P., Ft. Worth, TX, for alleged debtor.

Craig W. Weinlein, David S. Coale, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, TX, M. Fletcher Reynolds, Rosenthal, Reynolds, Mateer & Shaffer, P.C., Dallas, TX, for petitioning creditors.

### *MEMORANDUM OPINION*

BARBARA J. HOUSER, Bankruptcy Judge.

This contested involuntary petition was heard on April 19, 2000. The petitioning creditors seek the entry of an order for relief against the alleged debtor. The alleged debtor seeks the dismissal of the involuntary petition or, in the event the Court finds the involuntary filing proper, the transfer of the case to the Central District of California. The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding. 28 U.S.C. § 157(b). Five issues control the outcome.

First, whether the alleged debtor Jan McLendon Moss ("Moss") had twelve or more creditors on the petition date. The Court finds that Moss had twelve or more creditors.

Second, whether there are a sufficient number of petitioning creditors who hold sufficient claims to meet the requirements of § 303(b)(1) and/or (2). The Court finds that while three entities have filed the involuntary petition, those three entities only hold two claims against Moss. The Court further finds that the petitioning creditors hold non-contingent, non-disputed unsecured claims against Moss aggregating at least $10,775.00.

Third, whether Moss is generally paying her non-disputed debts as they become due. The Court finds that Moss is not generally paying her non-disputed debts as they become due.

Fourth, whether special circumstances exist which remove the three creditor requirement of § 303(b)(1). Under the facts of this case, such an exception exists and an order for relief is appropriate.

Fifth, whether venue of this case is proper in the Northern District of Texas and/or whether this case should be transferred to the Central District of California. Venue is proper here and the case will not be transferred.

### I. *Contentions of the Parties*

An involuntary chapter 7 petition (the "Involuntary Petition") was filed against Moss on February 9, 2000 (the "Petition Date") by petitioning creditors Larry O. Littleton ("Littleton"), Neville Charles Christopher Small ("Small") and Neville Beresford Wolfe Braithwaite ("Braithwaite") (collectively, the "Petitioning Creditors"). Thereafter, Moss filed a Motion for Order Dismissing Involuntary Petition or, in the Alternative, Transferring Venue to the Central District of California (the "Motion to Dismiss or Transfer"). In the Motion to Dismiss or Transfer, Moss contends that she had twelve or more creditors on the Petition Date; that Small and Braithwaite hold a single claim against her; and therefore, the Involuntary Petition lacks the requisite number of petitioning creditors with the requisite amount of claims.[1] Moss further contends that she has been generally paying her non-disputed debts as they become due; that the petitioning creditors filed the Involuntary Petition in bad faith; that this is essentially a two-party dispute between Moss and Littleton; that Littleton has an adequate remedy under state law that he is actively pursuing; and finally, that venue in the Northern District of Texas is improper.

The Petitioning Creditors contend that Moss had less than twelve creditors on the Petition Date and therefore only one petitioning creditor was required to properly file the Involuntary Petition. Alternatively, the Petitioning Creditors contend that if Moss had twelve or more creditors on the Petition Date, Small and Braithwaite each hold a right to payment against Moss and, along with Littleton, the required three creditors are present here. Finally, the Petitioning Creditors contend that in the event the Court concludes that the

---

1. At trial, Moss additionally asserted that the Petitioning Creditors do not hold the requisite amount of claims. Moss contends that Little-ton's claim is fully secured and that Small and Braithwaite are owed less than $10,-775.00.

Involuntary Petition is otherwise defective, special circumstances exist which remove the three creditor requirement of § 303(b)(1) and that venue is proper here.

## II. *The Underlying Facts*

Littleton's claims against Moss arose on April 7, 1995, when Moss entered into an employment contract with Littleton. *See* Exhibit 1.[2] Under that contract, Littleton was to form a Texas corporation called the Renaissance Group, Inc. ("Renaissance"), become its president, and set up offices in Dallas to conduct the corporation's business. Renaissance was to be a venture capital company for a group of wealthy investors, including Moss.

When Moss entered into the employment contract, she claimed to speak on behalf of that group of investors, and to be hiring Littleton on their behalf. These representations by Moss were false because no such group of investors existed. In an attempt to add credibility to her misrepresentations, Moss forged the signature of a supposed group member named Kent S. Powell, M.D. to the employment contract. Moss never paid Littleton pursuant to the employment contract.

Littleton sued Moss in August 1995 in the 160th District Court of Dallas County, Texas (the "Dallas State Court"). After two failed attempts to settle this litigation, a third settlement was reached on April 22, 1998 with the assistance of a court-appointed mediator. Both Moss and Littleton accepted the mediator's settlement proposal. *See* Exhibit 2. That proposal required Moss to make a series of payments to Littleton to avoid having an agreed judgment entered against her. After Moss failed to make any of the required payments, on June 26, 1998, the Dallas State Court entered a final judgment for $1.8 million in Littleton's favor, plus post-judgment interest at the rate of

10% per annum and court costs (the "Judgment"). *See* Exhibit 3. As of the Petition Date, Moss owed Littleton in excess of $2,000,000.00 on the Judgment.

Littleton undertook post-judgment discovery in an effort to collect the Judgment. Moss provided at least two affidavits regarding her assets in lieu of post-judgment asset depositions. *See* Exhibits 5 and 6. Littleton filed a Motion for Turnover Order in the Dallas State Court and on November 19, 1998, a Turnover Order was signed by the Dallas State Court directing Moss to assign various assets to Littleton. *See* Exhibit P. On December 18, 1998, the Dallas State Court entered an Amended Turnover Order (the "Turnover Order") requiring Moss to turnover essentially those same assets to the Dallas County Sheriff on or before December 28, 1998. *See* Exhibits 4 and Q. The Turnover Order listed numerous assets which Moss had admitted owning in her prior affidavits including: (1) funds in three bank accounts; (2) all funds Moss received as a result of a settlement with certain family members in June 1996 (the "McLendon Settlement Agreement"); (3) her stock in a California corporation called World Without Walls, Inc.; (4) her stock in a Costa Rica corporation called Rancho Playa Bejuco; (5) future payments to her from a family trust (the "Gay Noe McLendon Trust"); and (6) future payments to her of certain oil royalties.

Notwithstanding the Turnover Order requiring her to do so, Moss has never turned over any of those assets to the Dallas County Sheriff. While Moss appealed the Turnover Order, she never posted a supersedeas bond in connection with that appeal. *See* Exhibit R. To date, it appears that Moss has made no effort to comply with the Turnover Order.[3] Moss's

---

**2.** Petitioning Creditors' Exhibits are identified as Exhibits 1–21; Moss's Exhibits are identified as Exhibits A–CC.

**3.** Moss asserts that she has not turned over assets because she "has paid" the Judgment.

*See* Post–Trial Brief Regarding Opposition to Involuntary Petition at p. 11. For reasons explained below, this Court finds such assertion to be inaccurate at best and is part of the

appeal of the Turnover Order and a motion filed by Littleton to hold Moss in contempt are currently pending in the Dallas Court of Civil Appeals. *See* Exhibit BB.

Pursuant to the McLendon Settlement Agreement, Moss was entitled to receive, among other sums, the sum of $1,000,-000.00 from two Dallas family-based partnerships controlled by her brother, Bart McLendon, called Tri–State Theatres and The McLendon Company. *See* Exhibit 7A. That million dollars is to be paid over twenty-five (25) years without interest in monthly installments of $3,333.33. Littleton garnished this indebtedness in July 1998. Since September 1, 1998, these monthly installments have been paid into the registry of the Dallas State Court. To date, nineteen monthly payments (or approximately $63,333.27) have been paid into that registry. *See* Exhibit 8. In February 1999, the Dallas State Court entered an interlocutory partial summary judgment that Littleton had properly garnished the twenty-five year stream of monthly payments aggregating $1,000,-000.00. *See* Exhibit 9.

Beginning in mid–1999, Littleton also garnished several oil royalty checks to be paid to Moss by Texaco Production and Exploration, Inc. ("Texaco"). Approximately $18,074.22 has been trapped by these garnishments as of the Petition Date. *See* Exhibit 10. That money is also being held in the registry of the Dallas State Court.

During May 1998, while Moss was supposed to be making payments to Littleton pursuant to their settlement, Moss entered into a transaction with her brother, Bart McLendon, Tri–State Theatres and The McLendon Company. Pursuant to this transaction, Moss released Tri–State The-atres and The McLendon Company from an obligation to pay her at least $575,-000.00, and released several liens on real property in Texas that secured that obligation. In exchange, Bart McLendon caused Tri–State Theatres and The McLendon Company to pay $500,000.00 to Moss. Despite her contractual obligations to make payments to Littleton during this same time period, Moss did not pay any of those funds to Littleton. Moss apparently transferred those funds to two of her corporations, World Without Walls and Rancho Playa Bejuco.[4]

Upon discovery of the facts surrounding the May 1998 transaction, Littleton sued Moss, Bart McLendon, Tri–State Theatres and The McLendon Company in August 1998 to undo that alleged fraudulent transfer. The fraudulent transfer case was consolidated into the earlier-filed garnishment case. Over $200,000.00 has been paid into the registry of the Dallas State Court during the pendency of the fraudulent transfer portion of the case because of lis pendens filed by Littleton on all of the Texas properties affected by the alleged fraudulent transfer. *See* Exhibits 13, 14, and 15. Although the fraudulent transfer action was set for trial in February 2000, Moss's lawyers stated to Littleton's lawyers that the action would not proceed to trial in the Dallas State Court because Moss would file for relief under the Bankruptcy Code in California before trial could occur.

During post-judgment discovery against Moss, Littleton also became aware of two additional transfers made by Moss to a company controlled by her son, "Moss Micro." One transfer, made in late 1996 or early 1997, was for $50,000.00. The other, made in January 1997, was for $200,000.00. It appears that no value was given by

---

reason the Court views Moss's testimony with skepticism.

**4.** Notwithstanding substantial sums of money being invested into these corporations, neither was operating on the Petition Date. Moss testified that she did not believe stock certificates were actually issued for either of these corporations, did not know of the existence or location of the corporate formation documents for either of them and, with the exception of a small amount (approximately $5,000.00) of inventory of World Without Walls, could not testify as to what, if any, assets remain in them today.

Moss Micro in exchange for those transfers. In early 2000, Littleton sued Moss Micro in Dallas State Court to undo those alleged fraudulent transfers. *See* Exhibit 12.

The claim of Small and Braithwaite arises pursuant to an agreement entered into by them with Moss and Renaissance on or about May 5, 1995. *See* Exhibit 21. Pursuant to that agreement, Small and Braithwaite invested $25,000.00 with Moss to be used to purchase shares in Desert Moon Development Corp., Inc. ("Desert Moon"), a corporation specializing in medical technology and sales. Small and Braithwaite contend that they are owed $25,000.00 by Moss pursuant to their agreement with her.

Moss has made various inconsistent statements with respect to the claim of Small and Braithwaite. Moss initially admitted that Small and Braithwaite held a claim against her in the amount of $10,775.00. *See* Exhibit CC. However, at trial, Moss introduced an exhibit that inconsistently described the claim of Small and Braithwaite as having an "amount owed" of $9,464.00, but then went on to state that it was "disputed as to amount." *See* Exhibit B. But Moss then testified at trial that the amount currently owed to Small and Braithwaite was "either very very small or that [she] repaid the $25,000.00 in full."

Moss resides in the Central District of California. She lives in an apartment which she subleases from her fiancé, Ernest Owens. *See* Exhibits C and D. Moss is unemployed. She owns no real estate in California. Her only other assets include her car (claimed as exempt in the Dallas State Court action), a small bank account, and a right to receive payments from the Gay Noe McLendon Trust.

### III. *The Involuntary Petition*

■ The Petitioning Creditors must satisfy the requirements of 11 U.S.C. § 303 by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct.

654, 112 L.Ed.2d 755 (1991); *In re Eastown Auto Co.*, 215 B.R. 960, 968–69 (6th Cir. BAP 1998); *In re Xacur*, 216 B.R. 187, 194 (Bankr.S.D.Tex.1997); *In re Everett*, 178 B.R. 132, 139 (Bankr.N.D.Ohio 1994).

### A. *Who May Be Subject to an Involuntary Petition*

■ Section 303 authorizes the filing of an involuntary petition under chapter 7 or 11 against an entity who is eligible to become a debtor. Moss is eligible for relief under chapter 7 or 11.

### B. *Eligible Creditors with Qualifying Claims on the Petition Date*

Section 303(b) dictates who can properly file an involuntary chapter 7 or 11 case against an eligible debtor and provides:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if. such claims aggregate at least $10,000 [now $10,775.00] more than the value of any lien on property of the debtor securing such claims held by the holder of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $10,000 [now $10,775.00] of such claims;

11 U.S.C. § 303(b).

■ Thus, if there are twelve or more eligible creditors holding qualified claims on the Petition Date, three or more entities must participate in the involuntary filing and must hold unsecured claims ag-

gregating $10,775.00. If there are less than twelve creditors, a single creditor with an unsecured claim of $10,775.00 may file the involuntary petition. The policy considerations for these requirements are twofold: (1) "the fear that involuntary bankruptcy might be used by one or two recalcitrant creditors as a means of harassing an honest debtor" and (2) "the possibility that the threat of an involuntary petition would be used to compel the debtor to make preferential payments to one or more litigious creditors." *Matter of Sims,* 994 F.2d 210, 217 (5th Cir.1993), *cert. denied,* 510 U.S. 1049, 114 S.Ct. 702, 126 L.Ed.2d 669 (1994).

Moss contends that she had twelve or more qualified creditors on the Petition Date. The Petitioning Creditors disagree. While counting creditors with non-contingent, non-disputed unsecured claims existing as of the petition date sounds relatively straightforward, much case law exists with respect to these issues. As relevant here, the courts are divided on the question of whether small, recurring creditors should be counted for purposes of § 303(b).

In *Denham v. Shellman Grain Elevator, Inc.,* 444 F.2d 1376 (5th Cir.1971), the Fifth Circuit held that small, recurring bills, contracted to be paid monthly and on demand, such as claims for rent, groceries, and utilities are excluded from the creditor count and cannot be used by an alleged debtor to increase the number of creditors to greater than twelve in an effort to defeat an involuntary petition. While *Denham* was decided under the prior Bankruptcy Act, the Fifth Circuit declined to overrule it in a case decided under the Bankruptcy Code. *Matter of Runyan,* 832 F.2d 58, 60 (5th Cir.1987) ("Assuming without deciding that *Denham* remains viable after the enactment of the Bankruptcy Code, we conclude that the $600 to $800 claims appellants seek to exclude are much too large to constitute 'small' claims under *Denham's* rationale. Typically, the creditors excluded for § 303(b) purposes are those with claims of less than $25.").

Until overruled,[5] this Court is bound to follow *Denham* and exclude small, recurring claims from the creditor count. Although recognizing that at least one court has used the *Denham* rationale to exclude claims of up to $275.00, *see, e.g., In re Smith,* 123 B.R. 423 (Bankr.M.D.Fla. 1990), this Court concludes that is an inappropriate extension of *Denham.* This Court will apply *Denham* narrowly and exclude four creditors: (1) the City of San Juan Capistrano—$20.99; (2) San Diego Gas and Electricity—$58.00; (3) the Gas Company of Monterey Park. California—$10.62; and (4) Wells Fargo Bank—$25.04. Even with these claims excluded from the § 303(b) creditor count, this Court finds that Moss had twelve or more qualifying creditors in existence on the Petition Date.[6]

**5.** A number of courts have refused to follow *Denham. See In re Okamoto,* 491 F.2d 496, 498 (9th Cir.1974) ("[I]t appears to us that the *Denham* court ignored unambiguous Congressional direction.... [W]hen less than three creditors join in the petition ... the Act provides that the alleged bankrupt must have less than twelve creditors and expressly excludes certain types of creditors from the required computation. Since Congress made no distinction between large and small claims, we cannot arrogate unto ourselves the power to do so and thereby engraft an additional exception to the Act."); *Matter of Rassi,* 701 F.2d 627, 632 (7th Cir.1983) ("[R]egardless of how wise and salutary the exclusion of small, recurring claims might be, Congress has not specifically authorized exclusion, and ... we

have no authority to engraft it onto those that Congress expressly provided."); *In re Eastown Auto Co.,* 215 B.R. at 967–68; *In re Fischer,* 202 B.R. 341, 349–350 (E.D.N.Y. 1996); *In re Reid,* 107 B.R. 79, 82 (Bankr. E.D.Va.1989); *In re De Leonard,* 44 B.R. 922, 923 (Bankr.E.D.Pa.1984); *In re Hoover,* 32 B.R. 842, 847–48 (Bankr.W.D.Okla.1983); *see also In re Sedona Inst.,* 220 B.R. 74, 84 (9th Cir. BAP 1998) (Russell, J., dissenting).

**6.** Section 303(b)(2) excludes employee claims, insider claims and claims of any transferee of any voidable transfers from the creditor count. The Petitioning Creditors failed to offer any evidence that would permit this Court to exclude any of Moss's creditors on those grounds. It was their burden to do so. *See*

## C. *Whether Small and Braithwaite Hold One or Two Claims*

 Moss next contends that Small and Braithwaite hold a single claim against her, thereby causing the Involuntary Petition to be improperly filed. If an alleged debtor has twelve or more qualifying creditors, an involuntary petition may be commenced "... by three or more entities, each of which is ... a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, ..." 11 U.S.C. § 303(b)(1). As relevant here, the Bankruptcy Code requires that the Involuntary Petition be filed by "three entities" and that each of those entities hold a separate claim against Moss.

A claim is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...." 11 U.S.C. § 101(5)(A). Thus, while Small and Braithwaite are separate "entities" as defined by the Bankruptcy Code, the issue is whether Small and Braithwaite each have a right to payment from Moss separate from the other under applicable non-bankruptcy law.

The claim of Small and Braithwaite arises pursuant to a written agreement. That agreement defines Small and Braithwaite jointly as "INVESTORS" and Moss promises the same performance to them jointly as Investors. *See* Exhibit 21. Moreover, Moss testified that she considered her obligation to them to be a joint obligation and that all payments made by her to them pursuant to the agreement were made to them jointly. Cancelled checks corroborate Moss's testimony. *See* Exhibit J. Nothing in the agreement discloses a contrary intention. Small and Braithwaite did not appear or testify at the hearing.

General contract principles control the parties' respective rights and obligations. The agreement contains no choice of law provisions. However, since it appears that Small and Braithwaite were expected to execute the agreement within the State of Texas, and because one of the other parties to the agreement, Renaissance, is a Texas corporation, the Court will apply Texas state law to determine the rights of the parties.

 In *Guynn v. Corpus Christi Bank & Trust,* 620 S.W.2d 188, 190 (Tex. App.1981, writ ref'd n.r.e.), the court stated:

> Whether the liability of several promisors, whose interests are separate, is joint or several depends on the intention of the parties. The fact that several parties are named as promisors, while several others are named as promisees, is ordinarily indicative of a joint undertaking. Such a prima facie indication will not be controlling if the instrument, when considered in its entirely, discloses a contrary intention.

*See also United States Gypsum Co. v. Sampson,* 496 S.W.2d 687 (Tex.App.1973, no writ). Moreover, Section 297 of the Restatement (Second) of Contracts provides as follows:

> (1) Where a party to a contract makes a promise to two or more promisees for the benefit of two or more beneficiaries, the manifested intention of the parties determines whether he promises the same performance to all, a separate performance to each, or some combination.

> (2) Except to the extent that a different intention is manifested or that the interest of the obligees in the performance or in the remedies for breach are distinct,

*In re James Plaza Joint Venture,* 67 B.R. 445, 448 (Bankr.S.D.Tex.1986); *In re Global Waste Co.,* 207 B.R. 542, 544 (Bankr.N.D.Ohio 1997); *In re McDonald Trucking Co., Inc.,* 76 B.R. 513, 517 (Bankr.W.D.Pa.1987); *see also Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.,* 986 F.2d 709, 715 (4th Cir.1993).

the rights of obligees of the same performance are joint.

██ In light of the terms of the agreement, Moss's uncontradicted testimony that she considered her obligation to Small and Braithwaite to be a joint one, and the cancelled checks made payable to Small and Braithwaite jointly, this Court concludes that Small and Braithwaite hold a single claim against Moss for purposes of § 303(b).[7]

### D. *The Petitioning Creditors Hold Unsecured Claims Aggregating at Least $10,775.00*

Although Moss failed to identify this issue: (i) in her Motion to Dismiss or Transfer, (ii) in the Joint Pre–Conference Statement filed on April 7, 2000, or (iii) at the pretrial conference held with the Court, Moss contended at trial that the Petitioning Creditors did not hold unsecured claims aggregating $10,775.00.

██ The Court finds that Moss waived her right to raise this issue by not identifying it timely. *See Valley Ranch Dev. Co., Ltd. v. F.D.I.C.*, 960 F.2d 550, 554 (5th Cir.1992) (holding that the pre-trial order controls the scope of the trial and that claims or issues omitted from the pre-trial order are waived); *see also Marschand v. Norfolk & Western Ry. Co.*, 81 F.3d 714, 716 (7th Cir.1996); *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1195 (1st Cir. 1995), *cert. denied*, 517 U.S. 1136, 116 S.Ct. 1423, 134 L.Ed.2d 547; *Rios v. Bigler*, 67 F.3d 1543, 1549 (10th Cir.1995).

██ Alternatively, the Court will address the merits of this contention. Moss contends that because Littleton has garnished the $1,000,000.00 stream of payments to be paid to her over twenty-five years in monthly installments of $3,333.33, and because Littleton has garnished certain Texaco oil royalties, Littleton's claim is fully secured and/or "has been paid." Neither position is correct.

Because a chapter 7 trustee will be required to investigate the alleged perfection of Littleton in the $1,000,000.00 stream of payments, and because the trustee will have certain strong-arm powers under § 544 in connection with that investigation, the Court declines to determine whether Littleton is properly perfected in the $1,000,000.00 stream of payments by virtue of his garnishment of those funds and the orders entered by the Dallas State Court. However, for purposes of the remainder of the Court's analysis, the Court will assume that Littleton has a perfected lien on the $1,000,000.00 stream of payments.

As of the Petition Date, Littleton was owed in excess of $2,000,000.00 on the Judgment. Interest continues to accrue on the Judgment at the rate of 10% per annum. Thus, interest on the Judgment exceeds $200,000.00 annually. Because no interest is required to be paid on the $1,000,000.00 stream of payments pursuant to the McLendon Settlement Agreement,[8] at best Littleton has garnished Moss's right to receive $3,333.33 monthly or $39,-999.96 annually. Interest accruing on the Judgment exceeds the annual stream of payments garnished by Littleton in the Dallas State Court.

---

**7.** Several courts have held that joint holders of an obligation are counted as one creditor. *See In re Atwood*, 124 B.R. 402, 409 (S.D.Ga. 1991) (affirming unpublished bankruptcy decision holding joint holders of judgment constitutes single creditor for purposes of § 303(b)); *In re T.P. Herndon & Co.*, 87 B.R. 204, 206 (Bankr.M.D.Fla.1988) (finding because promissory note was made payable to a single entity, a probate estate, petitioning creditors held single right to payment constituting only one claim for purposes of § 303(b) even though note had been assigned to heirs);

*In re Averil, Inc.*, 33 B.R. 562, 563 (Bankr. S.D.Fla.1983) (concluding joint holders of promissory note constituted single creditor); *In re McMeekin*, 16 B.R. 805, 809 (Bankr. D.Mass.1982) (looking to Massachusetts law which states that a promissory note made payable to two or more individuals is enforceable only by all of them).

**8.** Absent a default in timely payment. *See* Exhibit 7A at p. 7.

With respect to the Texaco royalties, Moss contends that prior to Littleton's garnishment of those revenues, she received a monthly royalty check generally in the range of $3,000.00. Again, Moss contends that because this stream of income has been garnished by Littleton, Littleton's claim is either fully secured or "has been paid."

Littleton contends that the Texaco royalties must be garnished from time-to-time, that there is no garnishment of the entirety of the Texaco royalty stream. *See* Petitioning Creditors' Supplemental Brief, filed on April 24 at p. 3. Even assuming that Moss is correct, and assuming further that the average monthly payment of $3,000.00 continues indefinitely on those oil reserves, that money, together with the other garnished funds discussed above, is insufficient to cover the accruing interest on the Judgment.

The Judgment, with interest, exceeds the value of any collateral which may secure that Judgment. Thus, this Court finds that Littleton has a non-contingent, non-disputed unsecured claim against Moss of at least $10,775.00.[9]

### E. *Is Moss Generally Paying Her Debts as They Become Due*

The Petitioning Creditors contend that Moss is not generally paying her debts as they become due. Needless to say, Moss disagrees. The parties do agree, however, that in determining whether an alleged debtor is generally not paying her debts as they become due, this Court must look to four factors: (1) the number of unpaid claims; (2) the amount of such claims; (3) the materiality of the non-payments; and (4) the debtor's overall conduct in her financial affairs. *In re Norris*, 183 B.R. 437, 456–57 (Bankr.W.D.La.1995). An analysis of each of these factors in light of the facts of this case demonstrates that Moss is not generally paying her debts as they become due.

Moss admits that of the sixteen creditors she listed in her Motion to Dismiss or Transfer,[10] she is only making regular payment to her small, recurring obligations. The unpaid claims against Moss total at least $2.2 million, which consists of approximately 99% of the amount of her total debts. *See In re Concrete Pumping Serv. Inc.*, 943 F.2d 627 (6th Cir.1991) (holding that debtor was not paying debts as they became due where debtor was in default on 100% of its debt to only one creditor); *In re Fischer*, 202 B.R. at 351 (reversing dismissal of involuntary petition because debtor was not paying two outstanding debts which exceeded $2.1 million and debtor failed to establish that he was paying anywhere close to 50% of his current liabilities); *In re Garland Coal & Mining Co.*, 67 B.R. 514, 521 (Bankr.W.D.Ark. 1986) (debtor generally not paying debts as they become due where, although the debtor was paying most of its creditors in number, the total debt which it was not paying exceeded 50% of its outstanding liabilities); *Hill v. Cargill, Inc.*, 8 B.R. 779, 780–81 (D.Minn.1981) (finding that although the debtor paid its small consumer creditors, relief was appropriate due to the overwhelming total amount of unpaid claims).

There are several debts that Moss asserts she is generally paying when they come due. The Court finds this testimony to be incomplete and therefore inaccurate.

9. In light of the Court's conclusion regarding Littleton's claim, the Court does not need to determine the precise amount of the Small and Braithwaite claim. However, the credible evidence is that Small and Braithwaite do hold an unsecured claim against Moss.

10. Moss states that she had sixteen creditors on the Petition Date in both her Motion to Dismiss or Transfer and in the Joint Pre-Conference Statement filed on April 7, 2000. However, at trial Moss contended that she had eighteen creditors as of the Petition Date. These and other inconsistencies in Moss's positions and testimony were of concern to the Court. However, for the reasons stated previously at pp. 418–19, the Court concludes that Moss had twelve or more creditors on the Petition Date.

For example, Moss contends that she is paying her credit card debt to Wells Fargo and Citibank on a monthly basis. As far as it goes, that appears to be true. However, a closer analysis reveals that Wells Fargo has actually closed the Moss credit card account and each statement contains the following warning: "Your account is in serious condition! Your credit standing has been affected. It is urgent you contact us immediately at 1–800–988–8941." *See* Exhibit F–2. In addition, the balance owed to Wells Fargo is within a few hundred dollars of Moss's credit limit and the amount being paid monthly is only the minimum payment. That payment covers slightly more than the accruing finance charge, but barely reduces the outstanding balance on the card.

Similarly, Moss claims to be making regular payments on a Citibank Preferred Mastercard. The Court first notes that this card is not in Moss's name. Rather, the card is in the name of Moss's fiancé, Ernest Owens. Citibank is not a creditor of Moss. Mr. Owens has apparently loaned this card to Moss for her use. Moss is apparently the sole user of the card. Of course, Citibank will ultimately look to Owens for nonpayment, not Moss. While Moss does appear to be making payments to Citibank monthly, the outstanding balance on the account is within a few hundred dollars of Mr. Owens' credit limit and the amount being paid monthly is the minimum payment. Like Wells Fargo, this payment only covers slightly more than the accruing finance charge. *See* Exhibit F–1.

Moss also claims to be making regular payments to Cox Communications, her cable and internet provider. She introduced checks payable to Cox Communications. *See* Exhibit K–5. But the statements from Cox Communications reveal that Moss has not been generally paying her debt to Cox Communications on a timely basis. Exhibit I–1 contains the following warning: "Disconnect notice. Your account is seriously past due and service is subject to disconnection without further notice."

As to the materiality of Moss's non-payments, Moss has not made any payment on the Judgment; Moss has not made a payment to Small and Braithwaite since January 1997; the total amount of indebtedness owed to her law firm has increased by over $100,000.00 since August 1998, apparently without payment; Moss owes or will owe potentially significant sums to the United States, the State of California and the State of Louisiana for taxes arising from the McLendon Settlement Agreement or otherwise.

Moss has paid those creditors whose claims she wants to pay, rather than all of her outstanding debts. Moreover, it appears that Moss has attempted to delay creditors through the transfers of assets she has made. Her intentions with regard to the non-payment of at least the Littleton Judgment is evidenced by Exhibit 20, an e-mail sent on October 12, 1998 to her brother, Bart McLendon, in which she states "... don't worry about money going to Littleton; it won't because I ain't that stupid...." Moss's overall conduct of her financial affairs has been poor.

For all of these reasons, the Court finds that Moss has not been generally paying her debts as they become due.[11]

11. Moss also contends that the Involuntary Petition should be dismissed because (i) this is a two party dispute between Moss and Littleton and Littleton has another adequate remedy and (ii) the Petitioning Creditors failed to establish that they filed the Involuntary Petition in good faith. The Court disagrees. The two party dispute cases relied upon by Moss are distinguishable. Unlike this case, the courts in those cases found that only a single creditor was not being paid and, as a result, the courts further considered whether there were other adequate remedies available to the disgruntled creditor (whether there was a "special need" for bankruptcy relief). *See, e.g., Paroline v. Doling,* 116 B.R. 583, 586 (Bankr.S.D.Ohio 1990). In addition, the Court finds that the Petitioning Creditors acted in good faith.

424

Because Moss had twelve or more creditors on the Petition Date, and because the Petitioning Creditors only hold two claims against Moss, the Involuntary Petition is defective. Thus, absent the existence of an exception to the three creditor requirement, this Court would be bound to dismiss the Involuntary Petition.

F. *Whether There Is A Special Circumstance Exception to the Three Creditor Requirement Applicable in this Case*

■ This Court has found that the three creditor requirement is not applicable in a case involving alleged fraudulent conveyances and preferential transfers. *In re Norriss Bros. Lumber Co., Inc.,* 133 B.R. 599 (Bankr.N.D.Tex.1991). Based upon the alleged fraudulent transfers to or for the benefit of her brother, Bart McLendon, and certain of his related entities; the alleged fraudulent transfers to or for the benefit of her son and/or his company, Moss Micro; Moss's failure to comply with the Turnover Order; Moss's inability to explain the loss of significant sums of money paid to her within the last few years pursuant to the McLendon Settlement; Moss's inability to identify the whereabouts of certain monies and assets, including stock certificates in two wholly owned corporations, World Without Walls and Rancho Playa Bejuco, special circumstances within the meaning of *In re Norriss Bros. Lumber Co., Inc.* exist here.

Moss disputes that the judicially created "special circumstances" exception is applicable. Moss correctly points out that this special circumstances exception originally developed in single creditor cases where the courts were analyzing whether the failure to pay a single creditor could constitute a failure to pay debts generally. *See, e.g., In re Concrete Pumping Service, Inc.,* 943 F.2d at 630; *Matter of 7H Land & Cattle Co.,* 6 B.R. 29, 33 (Bankr.D.Nev. 1980). Relying on one court's refusal to follow *Norriss,* Moss contends that the *Norriss* expansion of that exception to the three creditor requirement of § 303(b)(1) was unwarranted. *See In re Rothery,* 211

B.R. 929, 934–935 (9th Cir. BAP 1997), *rev'd on other grounds,* 143 F.3d 546 (9th Cir.1998).

This Court disagrees. If an exception to one of the technical requirements of § 303(b) exists when there is fraud, trick, artifice or scam by an alleged debtor, this Court sees no logical reason why that exception should not be available to avoid dismissal of an involuntary petition on other technical grounds. In light of Moss's conduct here, the Court concludes that all creditors will be benefitted by the entry of an order for relief against Moss.

G. *Requested Transfer to the Central District of California*

Moss seeks a transfer of this case to the Central District of California where she resides. Two questions arise in connection with the requested venue transfer. First, is venue proper in the Northern District of Texas? Second, even if venue is proper here, should the case be transferred to the Central District of California for the convenience of the parties or in the interest of justice?

■ Venue would only be proper in the Northern District of Texas if Moss's principal assets are located here. 28 U.S.C. § 1408(1). Based upon the evidence, this Court finds that Moss's principal assets are currently located in the Northern District of Texas. Moreover, all other non–exempt assets should be here pursuant to the Turnover Order.

Moss's assets can be summarized as follows. Moss has a right to receive $1,000,-000.00 pursuant to the McLendon Settlement in monthly installments of $3,333.33. Those monies have been garnished in the Dallas State Court and approximately $63,000.00 is currently in the registry of the Dallas State Court. Moreover, an interlocutory summary judgment has been granted that those proceeds have been properly garnished by Littleton. Thus, that asset currently resides in the Northern District of Texas.

Moss has rights to receive certain oil royalties from Texaco. That asset is also subject to garnishment in Dallas State Court and approximately $18,000.00 is in the registry of the Dallas State Court.

Various voidable transfers are alleged to have occurred here. A chapter 7 trustee will investigate these transfers by Moss to various of her family members and their related entities. If the trustee believes that Moss has fraudulently transferred her assets, he will either substitute into that fraudulent transfer litigation currently pending in state court in the Northern District of Texas [12] or bring an adversary proceeding in this Court to recover that property for the benefit of all creditors.[13]

The only other assets Moss identified at trial are her car (presumably exempt), a small bank account in California, her stock in two defunct corporations (World Without Walls and Rancho Playa Bejuco—although she is not sure if stock certificates were ever issued or where the corporate documents are), and a right to receive monthly payments from the Gay Noe McLendon Trust. However, those assets (except for her car which she claimed as exempt) are all subject to the Turnover Order. Those assets are not here due to Moss's refusal to comply with that order.

Thus, this Court finds that Moss's principal assets are located in the Northern District of Texas or should be located in the Northern District of Texas and that venue is proper here.

Moss seeks a transfer of the case to the Central District of California. To transfer, the Court must find a transfer to be in the interest of justice or for the convenience of the parties. 28 U.S.C. § 1412. The decision to transfer or retain a case lies within the sound discretion of the court. *Matter of Commonwealth Oil Refining Co., Inc.*, 596 F.2d 1239 (5th Cir.

1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980). The burden of establishing that a case should be transferred is on the moving party and must be shown by a preponderance of the evidence. *See, e.g., In re Weatherly Frozen Food Group, Inc.*, 133 B.R. 862 (Bankr.N.D.Ohio 1991); *In re Pope Vineyards*, 90 B.R. 252 (Bankr.S.D.Tex.1988); *In re Toxic Control Technologies, Inc.*, 84 B.R. 140 (Bankr. N.D.Ind.1988).

In exercising its discretion, this Court must weigh a number of factors including:

(1) the proximity of creditors of every kind to the Court;

(2) the proximity of the debtor to the Court;

(3) the proximity of the witnesses necessary to the administration of the estate;

(4) the location of the assets;

(5) the economic administration of the estate; and

(6) the necessity for ancillary administration.

*Commonwealth Oil*, 596 F.2d at 1247. According to the *Commonwealth Oil* court, the most important of these considerations is whether the requested transfer would promote the economic and efficient administration of the estate. *Id.*

The Court concludes that this case can be administered more economically and efficiently in the Northern District of Texas. Since Moss is unemployed and has few assets in the State of California, the heart of this case will be the investigation and potential recovery of transferred assets. Since the primary beneficiaries of those transfers have already been sued in the Northern District of Texas and, in some instances, actually reside in the Northern District of Texas, that litigation

---

12. Approximately $200,000.00 sits in the registry of the Dallas State Court in connection with the already filed fraudulent transfer lawsuit.

13. Alternatively, the trustee could substitute into the state court litigation and then remove it to this Court. 28 U.S.C. § 1452.

can be handled more efficiently and economically here.

The Petitioning Creditors are Moss's largest creditors. They want the case administered here. Moss's lawyers hold a significant unsecured claim. They reside here. Other potentially significant creditors (the United States and the State of Louisiana for unpaid taxes) can participate here as easily as they could participate in the Central District of California.

Witnesses whose testimony may be necessary to the administration of this estate appear to be divided fairly evenly between Texas and California. While Moss and her son reside in California, Moss's brother and his entities, Tri–State Theatres and The McLendon Company reside here.

The fact that Moss resides in California is beyond dispute. Obviously, it would be more convenient for her if the case were transferred to California. However, after taking all of the evidence into consideration and weighing all of the relevant factors, the Court concludes that Moss failed to carry her burden of establishing that this case should be transferred to the Central District of California.