**In re The CONSOLIDATED COMPANIES, Debtor.**

**In re SOUTHMARK CORPORATION, Debtor.**

Bankruptcy Nos. 389–31065–SAF–11, 389–36324–SAF–11.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Oct. 19, 1989.

See also, Bkrtcy., 113 B.R. 280.

George F. McElreath, Asst. U.S. Trustee, Dallas, Tex.

Richard Roberson, Gardere & Wynne, Dallas, Tex.

Sander L. Esserman, Stutzman & Bromberg, Dallas, Tex.

Martin F. Brecker, Mark D. Silverschotz, Anderson Kill Olick & Oshinsky, New York City.

Lewis Kruger, Strook & Strook & Lavan, New York City.

Paul Wickes, Thompson & Knight, Dallas, Tex.

Robert L. Coley, Office of U.S. Trustee, Atlanta, Ga.

Jesse Austin, Powell, Goldstein, Fraser & Murphy, Atlanta, Ga.

Joel B. Piassick, P. Steven Kratsch, Smith, Gambrell & Russell, Atlanta, Ga.

R. Neal Batson, examiner, C. David Butler, Alston & Bird, Atlanta, Ga., for examiner.

## MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Bankruptcy Judge.

The Consolidated Companies, a debtor in this court, case number 389–31065–SAF–11, has moved this court to transfer venue of the Southmark Corporation bankruptcy case to this court. Although written in narrative form, this memorandum opinion

and order contains the court's findings of facts and conclusions of law required by Bankruptcy Rules 7052 and 9014.

Southmark Corporation filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code in the Northern District of Georgia on July 14, 1989. The Consolidated Companies (TCC) filed its petition in the Northern District of Texas on February 24, 1989. Asserting that TCC and Southmark are affiliates as defined by the Bankruptcy Code, TCC moved this court to transfer Southmark's venue under Bankruptcy Rule 1014. TCC filed its motion on September 18, 1989. This court set a hearing on the motion for October 11, 1989.

On October 3, 1989, counsel for TCC and counsel for Southmark presented this court with an agreed order transferring venue wherein Southmark stipulated for purposes of Rule 1014(b) consideration only that Southmark and TCC are affiliates and that venue should be transferred to this court in the interests of justice, for the convenience of the parties and to avoid delay to Southmark's reorganization effort.

Mindful that venue is a privilege personal to a litigant, here Southmark, the debtor, that Southmark does not object to the transfer of venue, that Southmark's unsecured creditors and other parties in interest have no right to direct venue but do have a right to be heard on the issue of the propriety of the transfer of venue from one court of proper venue to another, see *Hunt v. Bankers Trust*, 799 F.2d 1060, 1068 (5th Cir.1986), this court accepted the agreed order subject to review if objections were filed by October 10, 1989, to be heard when the motion to transfer venue was originally set on October 11, 1989. All parties in interest in the Southmark case have a right to be heard on the Rule 1014 motion.

Given the provisions of Rule 1014, Southmark's stipulation of affiliate status for purposes of that rule and Southmark's lack of objection to the venue transfer, the court transferred venue effective immediately upon entry of the agreed order on October 3, 1989. The court did so because "[i]t is imperative that authority be vested clearly in a bankruptcy court to issue any needful orders, for the Chapter 11 petitioners must continue as going businesses and the debtor in possession must take steps to conserve the assets of the ... Chapter 11 estate[.]" *Hunt*, 799 F.2d at 1070. The court assigned case number 389–36324–SAF–11 to the Southmark case.

Southmark's official committee of equity security holders, the Resolution Trust Corporation, a Southmark creditor, and the Phoenician group of Southmark creditors objected to the transfer of venue. The United States Trustee filed its comments concerning the motion urging this court to conduct an evidentiary hearing on the issue of affiliation under Rule 1014(b) prior to the court's determination of the proper venue of the Southmark proceeding. The court conducted a hearing on the objections on October 11, 1989.

This court has jurisdiction; the venue issue under Rule 1014(b) constitutes a core matter. Although not jurisdictional, parties may nevertheless not stipulate, absent an evidentiary basis, that this court does or does not constitute the appropriate court to decide the venue motion under Rule 1014(b). This court must determine on a full record whether it constitutes the proper court to hear the change of venue motion. See *In re Reddington Investments Ltd. Partnership—VIII*, 90 B.R. 429 (9th Cir. BAP 1988); see also *In re Maruki USA Co.*, 97 B.R. 166 (Bankr.S.D.N.Y. 1988). The court therefore set a de novo evidentiary hearing for October 16, 1989.

The objecting parties requested that the court vacate its October 3, 1989, order and lift the Rule 1014(b) stay pending the evidentiary hearing. Because of the state of the record, because of the expedited setting for the evidentiary hearing, because of the Fifth Circuit's mandate in the *Hunt* case, quoted above, and because of the unfairness to the bankruptcy court of the Northern District of Georgia in the hiatus, this court declined to vacate its October 3, 1989, order or to lift the Rule 1014(b) stay pending the de novo evidentiary hearing.

The court conducted the evidentiary hearing on October 16, 1989. The Resolu-

tion Trust Corporation and Phoenician group, having engaged in discovery, did not pursue their objections, although they did not withdraw their objections. The equity security holders committee did pursue its objections.

### Proper Court Under Rule 1014(b)

On March 11, 1988, Southmark acquired 40% of the equity of and 80% of the voting control of TCC. On February 23, 1989, Southmark returned its shares of TCC stock to TCC. Southmark holds a promissory note which, with the authority of TCC shareholders, can be converted to shares of TCC stock amounting to a greater than 50% interest in TCC.

TCC's primary business is the management of residential and commercial properties. Its secondary business is commercial real estate brokerage. In March 1988 TCC had 4000 employees and managed about 300 properties in approximate 37 states. In March 1988 TCC's principal place of business was in Atlanta, Georgia. Southmark desired to manage Southmark's property management contracts and TCC's property management contracts with the same employees. Southmark closed TCC's place of business in Atlanta in November or December 1988, and moved TCC's place of business to 1601 LBJ Freeway, Dallas, Texas, which was and is Southmark's principal place of business.

Since that move all operations for properties for which TCC has property management contracts have been handled by employees of Southmark or its subsidiaries in Dallas. All on-site employees managing TCC properties are employees of Southmark or its subsidiaries. All regional executives responsible for management of the TCC properties are employees of Southmark or its subsidiaries. All home office executives responsible for management of TCC properties are employees of Southmark or its subsidiaries. No Southmark employee presently responsible for managing TCC properties was ever an employee of TCC.

All monies collected from properties for which TCC has management contracts are deposited in site bank accounts managed by Southmark employees. Those monies are deposited in accumulation accounts managed by Southmark employees. Checks are then disbursed by Southmark to TCC for TCC's share of management fees.

Southmark employees perform all maintenance improvements with regard to properties for which TCC has management contracts.

On October 17, 1988, Southmark and TCC entered a Joint Operating Agreement to provide a formula for sharing management fees. The Joint Operating Agreement contemplated that TCC and Southmark and their subsidiaries would combine all of their property management businesses. Indeed, that is precisely what they accomplished with Southmark operating all of TCC's property management business. Robert Irvine executed the Joint Operating Agreement for many of the TCC subsidiaries. Mr. Irvine was a TCC vice president. He became president of TCC in December of 1988 and remained president until February 24, 1989. During that same time period, Mr. Irvine was a Southmark officer. On January 1, 1989, Southmark and TCC amended their Joint Operating Agreement. Mr. Irvine executed the amendment as TCC president. The amendment describes that the Joint Operating Agreement provides for property management on a joint basis but contemplates that Southmark's subsidiary employees would perform all property management functions. Under this Joint Operating Agreement, as amended, Southmark performed all operations of TCC's property management business. To the extent that the services performed went beyond the four corners of the agreement, the services were consistent with the expressed objectives of the agreement and the court infers that Southmark performed with TCC's consent, given Mr. Irvine's dual capacity.

On the eve of TCC's February 24, 1989, bankruptcy filing, TCC and Southmark executed Amendment No. 2 to the Joint Operating Agreement. In March, 1989, TCC and Southmark executed Amendment No. 3. Amendment No. 2 provides at Section 1:

"Nothing in the Joint Operating Agreement shall grant or create any right in TCC or Southmark to own, manage, or control the business or assets of the other." Amendment No. 3, dated March 1989 provides:

1. SCMI and SMC are hereby requested, and shall, continue to provide assistance under the Joint Operating Agreement to TCC Subsidiaries in the rendition of Property Management Services and Other Services.

2. Neither Southmark nor the Southmark Subsidiaries shall have the right to operate the business or manage the property of TCC or the TCC Subsidiaries and the performance of duties pursuant to the Joint Operating Agreement shall not be deemed an operation or management by Southmark Corporation or by the Southmark Subsidiaries of the business or property of TCC or the TCC Subsidiaries.

3. TCC shall have the right to direct and control the services rendered by property-level employees under Management Agreements whereby TCC or the TCC Subsidiaries are to provide Property Management Services or Other Services. Nothing in the Joint Operating Agreement shall grant or create any right to TCC or Southmark or any subsidiary of either to own, manage, or control the business or assets of the other or any subsidiary of the other.

Amendment No. 4, effective May 1, 1989, Amendment No. 5, dated July 1, 1989, and Amendment No. 6, dated September 1, 1989, contained that language. Under Amendment No. 3, the Joint Operating Agreement would expire April 30, 1989. Under Amendment No. 4, the Joint Operating Agreement would expire June 30, 1989. Under Amendment No. 5, the expiration date would be August 31, 1989, and under Amendment No. 6, the expiration date would be October 31, 1989. Amendments 2 through 6 to the Joint Operating Agreement do not create rights or alter the business reality created by the October 1988 Joint Operating Agreement and the parties' actual performance thereunder from October 1988 until and through the present.

With the amendments TCC preserved postpetition and did not give up its corporate sovereignty but Southmark nonetheless actually operated TCC's primary business under the Joint Operating Agreement, and continues to do so.

On November 1, 1988, TCC and Southmark also entered a Corporate Overhead Reimbursement Agreement. Although TCC has obtained its own executive offices since its bankruptcy filing, Southmark had provided offices and provides furniture, telephones, security services and other business operations for TCC.

TCC has seven employees. Management of TCC's property management contracts requires the employment of 1200 to 1500 Southmark or Southmark subsidiary employees.

This court entered a series of orders in the TCC case authorizing TCC's execution and entry into Amendments 3 through 6 of the Joint Operating Agreement. The orders, being in nature agreed orders between TCC and Southmark, provide, in part, "IT IS FURTHER ORDERED that the services will be rendered subject to the direction and control of The Consolidated Companies and its subsidiaries, with Southmark deemed not to be operating the business or property of The Consolidated Companies under a lease or operating agreement, for purposes of Bankruptcy Code 101(2)(D)." The orders are all interim, limited term orders to run in conjunction with the term of the relevant Joint Operating Agreement amendment.

Under Rule 1014(b), the court must decide whether Southmark constitutes an affiliate of TCC as defined in the Bankruptcy Code as of July 14, 1989, the date Southmark filed its voluntary petition in the Northern District of Georgia. Section 101(2)(D) of the Bankruptcy Code defines affiliate as an "entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement."

On July 14, 1989, Southmark operated all of TCC's property management business. TCC's property management business con-

stitutes substantially all of TCC's business. Southmark operated this TCC business under a Joint Operating Agreement entered into in October 1988 and amended January 1, 1989. All subsequent amendments, namely amendments 2 through 6, specifically provided that the Joint Operating Agreement did not grant or create any rights in TCC or Southmark to own, manage or control the business or assets of the other. Nonetheless, this court finds that the Joint Operating Agreement provided the umbrella agreement for Southmark to close TCC's separate property management operations, to replace TCC's employees with its own and to operate TCC's property management business. Southmark has done so from late 1988 until the present.

Notwithstanding that business reality, the equity security holders committee urges that this court preclude review of the affiliate issue by virtue of this court's orders allowing TCC to extend the Joint Operating Agreement. This court entered those orders in the TCC case. Therefore, the orders do not establish the law of the case in the Southmark case.

A bankruptcy court order is, however, entitled to the effect of res judicata. *Southmark Properties v. Charles House Corp.,* 742 F.2d 862, 869 (5th Cir.1984). Essential to the application of res judicata is the principle that the previously unlitigated claim to be precluded could and should have been brought in the earlier litigation. *D–1 Enterprises, Inc. v. Commercial State Bank,* 864 F.2d 36, 38 (5th Cir.1989), citing *Southmark Properties,* 742 F.2d at 871. The unlitigated claim is whether this court constitutes the proper court for determining a motion to transfer venue under Rule 1014(b). That question could not have been litigated until Southmark filed its bankruptcy petition on July 14, 1989. If this court gave res judicata effect to the court's pre-July 14, 1989, affiliate issue in the TCC case, the court would in effect dictate the Rule 1014(b) motion. Since that matter could not have been before the court in the TCC case prior to July 14, 1989, the orders should not be given res judicata effect to preclude the Rule 1014(b) claim. *See Republic Supply Co. v. Shoaf,* 815 F.2d 1046, 1052 (5th Cir.1987).[1]

Furthermore, for res judicata effect there must be an identity of parties. *Shoaf,* 815 F.2d at 1051. Prior to the Southmark filing, the creditors and equity security holders of Southmark were not parties in the TCC case. Because of the effect of a finding on affiliate on TCC's claims in the Southmark case, the orders in the TCC case should not be subject to the res judicata doctrine when Southmark's creditors and equity security holders had not been parties in the prior proceeding.

Also, for res judicata effect, there must have been a final judgment on the merits. *Shoaf,* 815 F.2d at 1051, 1053. Like the pre-July 14, 1989, orders, the post-July 14, 1989, orders regarding the Joint Operating

---

1. The equity security holders committee have urged the court to apply the res judicata doctrine. Collateral estoppel may be the principle actually advanced. The doctrine of res judicata encompasses two separate principles: claim preclusion and issue preclusion, which is also known as collateral estoppel. The committee argues that the affiliate issue should be precluded by the court's previous orders addressing the TCC and Southmark relationship. In the Fifth Circuit, collateral estoppel effect may be given to a prior federal order or judgment only if (1) the issue at stake in the present case is identical to an issue involved in the prior case; (2) the issue was actually litigated in the prior case; and (3) the resolution of the issue in the prior case was a critical and necessary part of the earlier judgment. *United States v. MONKEY,* 725 F.2d 1007, 1010 (5th Cir.1984).

The committee has not established the last two elements. Even though the element is relaxed somewhat for consent orders, the affiliate issue was not actually litigated. The affiliate issue was not a critical and necessary part of the earlier judgment. The court could have granted the relief requested by TCC without accepting the agreed order or otherwise addressing the affiliate issue. Southmark sought the entry of the agreed order, in part, to protect its venue options. Given that 1200 to 1500 Southmark or Southmark subsidiary employees are effected, the court infers that Southmark likely would have continued performing even without that language. Thus, the committee has not established that the issue was even critical and necessary to Southmark let alone critical and necessary to the judgment. The prior rulings do not preclude litigation of the affiliate issue on the Rule 1014(b) motion.

274

Agreement are interim, limited term orders, the last of which expires on October 31, 1989. Consequently, they are not final judgments on the merits of the affiliate issue. Furthermore, they are agreed orders. This court ruled at the outset of this ruling that, absent an evidentiary basis, Southmark and TCC could not stipulate that this court was or was not the proper court to decide the Rule 1014(b) motion. In effect, Southmark sought the agreed language regarding § 101(2)(D) to protect its venue options and to keep its assets separate. The former purpose cannot be translated into an agreed order, absent an evidentiary basis, to support a stipulation to the Rule 1014(b) proper court claim. Further, until TCC filed its motion to transfer venue in the Southmark case, there had been no identity of parties as Southmark's creditors and equity security holders were not before the court in the TCC case. Thus, on the issue of the proper court to determine venue for Rule 1014(b) purposes, the pre and post July 14, 1989, orders regarding the extension of the Joint Operating Agreement do not constitute final judgments on the merits, nor was there identity of parties necessary for res judicata to be applied to the affiliate issue to preclude the Rule 1014(b) proper court claim.

Equitable estoppel should not apply. The record does not support a finding that any party has detrimentally relied on the court's orders in the TCC case to preclude the Rule 1014(b) motion. The equity securities holders committee wants compensation for this litigation, but professionals retained by the committee with court approval are paid by the estate. Until Southmark's bankruptcy, Southmark's creditors had no opportunity to be heard on the affiliate issue. That issue, as noted above, would have a potential impact on subordination and other issues in the Southmark case. While not deciding those issues, lack of an opportunity to be heard precludes giving the court's orders in the TCC case estoppel effect on the affiliate issue in the Southmark case.

■ The United States Trustee and the objecting parties are concerned with the integrity of the system. Obviously, the court must insure the integrity of the system. The court has not permitted Southmark to stipulate directly or indirectly, absent an evidentiary basis, to the question of whether this is the proper court to hear the change of venue motion. Rather, the court has conducted a de novo evidentiary hearing. The integrity of the judicial system now compels the court to look past the agreed orders in the TCC case to extend the Joint Operating Agreement orders, motivated by Southmark's venue considerations, and to look past the agreed order to change venue in the Southmark case, motivated by Southmark's opposite venue consideration, and to focus instead on the business reality. Under their Joint Operating Agreement, Southmark operates TCC's primary business. Therefore, for purposes of Rule 1014(b) Southmark is an affiliate as defined by § 101(2)(D) of the Bankruptcy Code making this court the proper court to hear the change of venue motion.

*Venue*

■ On motion and after hearing on notice, this court may determine, in the interest of justice or for the convenience of the parties, the district in which the case should proceed. Rule 1014(b). When a case is filed in a proper venue, the court should cautiously exercise its power to transfer venue. *In re Commonwealth Oil Refining Co.*, 596 F.2d 1239, 1241 (5th Cir. 1979), *cert. den.*, 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980). The Fifth Circuit's holding in *Commonwealth* applies to venue motions under the Bankruptcy Code and current rules. *In re Pope Vineyards*, 90 B.R. 252 (Bankr.S.D.Tex.1988). A court considering whether a transfer of venue would be in the interests of justice or for the convenience of the parties must consider (1) the proximity of creditors of every kind to the court; (2) the proximity of the debtor to the court; (3) the proximity of the witnesses necessary to the administration of the estate; (4) the location of the assets; (5) the economic administration of the estate; and (6) the necessity for ancillary administration if bankruptcy should result. *Commonwealth*, 596 F.2d at 1247.

(1) The proximity of creditors of every kind to the court.

Approximately 75% of Southmark's unsecured indebtedness comprises publicly-held debt securities. The holders of those securities are located all over the United States. The bulk of those securities are held in "street-name" by New York depositories. The indenture trustees on those instruments are located in Dallas, New York, Pittsburgh and Geneva, Switzerland.

The 11 members of the unsecured creditors' committee are located in New York (four members), Dallas, Pittsburgh, Memphis, Los Angeles, Chicago, Washington, D.C. and Phoenix. The counsel, accounts and financial advisor to the creditors' committee are all located in New York. The creditors' committee supports the transfer of venue to Dallas. Southmark's other creditors are located all over the country.

Neither of the original objecting creditors are located in Atlanta. The Resolution Trust Corporation is located in Washington, D.C. and appears as managing agent for seven savings and loans located in Arizona, California, Savannah, Georgia, Kansas and Florida. The Phoenix group is located in Phoenix and California. The objecting creditors did not pursue their objections at the evidentiary hearing.

As to the equity security holders, Southmark has in excess of 12,000 shareholders. While many of the shares are held in "street-name" by New York depositories, the shareholders are located all over the United States. Although objecting to the venue change, the equity security holders committee concedes that the shareholders are located primarily in New York and the northeast. The five member equity security holders committee is comprised of three members from New York, one member from Boston and one member from Cincinnati. The counsel and financial advisor to the committee are located in New York. The committee has retained an Atlanta counsel and represents that if venue is transferred it will seek court approval to retain local Dallas counsel.

Since the creditors and shareholders are located throughout the United States, and since the creditors committee supports the venue transfer, and since the equity security holders committee has not established a factor under this category to support continuation of venue in Atlanta, this factor weighs in favor of a transfer of venue to Dallas.

(2) The proximity of Southmark to the court.

Southmark's principal place of business is 1601 LBJ Freeway, Dallas, Texas. Southmark also maintains an Atlanta office. 25 of Southmark's 26 senior officers work at Southmark's Dallas headquarters. Southmark and its subsidiaries have more than 438 employees at its Dallas headquarters, excluding employees of National Heritage, Inc., and other subsidiaries located away from the headquarters. Southmark has only 11 employees at its Atlanta office. This factor weighs in favor of a transfer of venue to Dallas.

(3) The proximity of the witnesses necessary to the administration of the estate.

Chairman, President and Chief Executive Officer of Southmark, Arthur G. Weiss, is located in Atlanta but regularly comes to Dallas and supports the venue transfer. The other 25 senior officers work at Southmark's Dallas office. The people responsible for the overall management, coordination and operation of Southmark are located in Dallas. The corporate employees who must appear in court are located in Dallas. Southmark's overall financial management is located in Dallas.

Southmark's principal corporate records are located at its Dallas office. Southmark's consolidated financial statements are prepared by staff in Dallas. Southmark's independent auditors and its accountants retained in the bankruptcy case are located in Dallas. Southmark's computerized data processing is based in Dallas. Southmark's principle debtor-in-possession bank accounts are in Dallas.

This factor weighs in favor of a transfer to Dallas.

(4) The location of the assets.

Southmark's assets are located all over the United States. Southmark's largest asset is its wholly-owned subsidiary, the San Jacinto Savings Association. San Jacinto Savings Association is a Texas chartered thrift with branches in Houston, Dallas and elsewhere in Texas. Southmark's other assets include MGF Oil subsidiary, based in Midland, Texas and National Heritage, Inc., based in Dallas. Southmark owns 100% of the stock of a substantial number of other subsidiaries, including Southmark/Envicon Capital Corporation, Southmark Commercial Management, Inc., Envicon Development Corporation and Southmark–McNeil Holding, Inc., most of which are headquartered in Dallas. Southmark owns directly or through subsidiaries real estate throughout the United States, including significant real estate in Texas. Mr. Weiss reports that Southmark's holdings in Georgia are less significant.

Although Southmark's assets are located throughout the United States, a greater portion of significant assets are located in Texas than in Georgia so that this factor weighs in favor of a transfer of venue to Dallas.

(5) The economic administration of the estate.

Southmark's financial management is in Dallas. Southmark has no executive committee. Its board of directors alternates monthly meetings between Dallas and Atlanta. Southmark's five executive vice presidents have concluded that from a functional point of view, considering Southmark's day to day operations, the case would be more economically administered in Dallas. Mr. Weiss has likewise concluded that the proximity of Southmark's managerial personnel to the bankruptcy court is crucial to the convenient administration of Southmark's estate. Southmark's management personnel, located in Dallas, are the people who manage Southmark's assets and who, in Mr. Weiss' view, will be essential to the development of a successful financial reorganization plan for Southmark. Counsel have been located in South-

mark's offices and counsel has its office located within a 20 to 30 minute drive from Southmark's office in Dallas. According to counsel for the creditors' committee at the October 11, 1989, hearing, most reorganization meetings between Southmark and the creditors' committee have been in Dallas, with only one outside of Dallas and that in Houston.

Mr. Weiss testified that Southmark originally filed its bankruptcy petition in the Northern District of Georgia because of Southmark's concern with the size and congestion of the bankruptcy docket in the Northern District of Texas. While this court questions whether that constitutes the whole story, the court has no other evidence before it and the court is acutely aware of the bankruptcy docket in the Northern District of Texas. But the court has no evidence of the size of the docket in the Northern District of Georgia and no evidence to suggest that the case can be more economically administered in the Northern District of Georgia. No substantive issues have been decided or are pending in the Northern District of Georgia. Procedural and case administration rulings can be implemented, as appropriate, by this court. The equity security holders committee feels comfortable with the proceedings in the Northern District of Georgia and have retained Atlanta counsel. Southmark and the creditors' committee conclude, however, that the case can be more efficiently managed in Dallas where Southmark has its principle place of business and where Southmark has the crux of its financial reorganization management. The evidence does not support a finding of any harm to any party in interest to a venue transfer, except for the learning effort for local counsel, which, at this stage of the proceedings, is not significant.

The economic administration of the estate weighs in favor of a transfer of venue to Dallas.

(6) The necessity for ancillary administration if bankruptcy should result.

The parties have presented no evidence on this element. Presumably, this element

would address liquidation. Because of a lack of evidence, this element need not be further considered.

### Conclusion

Southmark and its witnesses necessary to the administration of the estate are more conveniently available in the Northern District of Texas. Creditors are located throughout the country but the unsecured creditors' committee supports a transfer of venue to the Northern District of Texas. While assets are located throughout the United States, Southmark's largest single subsidiary is in Texas and a greater portion of significant assets are located in Texas than in Georgia. The economic administration of the estate is best served in Dallas where the people who manage Southmark and its finances are located. That may be the most significant factor. *Commonwealth Oil*, 596 F.2d at 1247. Other than comfort and the need to duplicate the learning for local counsel, the equity security holders' committee points to no factor that offsets these considerations. Therefore, in the interests of justice and for the convenience of the parties, venue should be in the Northern District of Texas.

### Orders

Upon the foregoing,

IT IS ORDERED that The Consolidated Companies' motion to transfer venue of the Southmark Corporation bankruptcy case is GRANTED.

IT IS FURTHER ORDERED that the court's order entered October 3, 1989, shall be amended to be an interim order.

IT IS FURTHER ORDERED that venue of the Southmark Corporation bankruptcy case is transferred from the Northern District of Georgia to the Northern District of Texas, effective October 3, 1989. In the Northern District of Texas, the Southmark Corporation case shall carry case no. 389–36324–SAF–11.