**In re INTERLINK HOME HEALTH CARE, INC., Debtor.**

**No. 02–45210–DML.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Sept. 12, 2002.

Steven Thomas Holmes, Hunton & Williams, Dallas, TX, for Debtor.

Robert Michaelson, New York City, Lewis Sessions, San Antonio, TX, for plaintiff.

Donna Webb, Fort Worth, TX, for HHS.

## MEMORANDUM OPINION AND ORDER

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the Court are the questions of (1) the appropriate venue as between this district and the District of Delaware for the administration of the chapter 11 cases of Interlink Home Health Care, Inc. ("Interlink") and 13 subsidiaries (the "Interlink Subsidiaries"); and (2) whether chapter 11 cases filed in the District of Delaware by Phoenix Group Corporation ("Phoenix") and its wholly owned subsidiary, Americare Management, Inc. ("Americare" and, together with Phoenix, the "Phoenix Debtors") can and should be transferred to this district pursuant to FED. R. BANKR.P. 1014. The Court heard evidence and argument on these issues on September 4, 2002. As the venue issue is presented by motion, the Court will additionally consider prior proceedings in the cases of Interlink and the Interlink Subsidiaries. This memorandum opinion and order constitutes the Court's findings of fact and conclusions of law. FED. R. BANKR.P. 7052 and 9014.

### I. Background

Interlink and the Interlink Subsidiaries are in the business of providing home health care. Their largest source of revenue is the United States Department of Health and Human Services ("HHS"). HHS is also Interlink's largest unsecured creditor. Phoenix is a publicly held company which conducts business through subsidiaries including Americare. Both Phoenix and Americare are holding companies.

Prior to the commencement of Interlink's chapter 11 case, all of its issued and outstanding common stock was sold by Gary Humberson ("Humberson") to Americare. At that time substantially all of the assets of Interlink were pledged to secure loans from both DVI Business Credit Corporation ("DVI") and Health Care Industry Fund, Ltd. ("HCIF"). While Interlink remains indebted to DVI,[1] after sale of the stock by Humberson to Americare, HCIF conveyed to Intrepid of Texas, Inc. ("Intrepid"), its rights against Interlink. Among the items transferred by HCIF to Intrepid were a stock certificate in the name of Humberson representing the total number of issued and outstanding shares of common stock of Interlink and a five page Pledge Agreement (the "Pledge Agreement") bearing Humberson's signature.

The Pledge Agreement provides that "Pledgor [Humberson] hereby delivers to Secured Party certificates evidencing, and grants to the Secured Party a . . . Security Interest in, the Collateral [Interlink's stock], accompanied by stock powers . . . ." (Pledge Agreement, ¶ 2). The Pledge Agreement also provides that no portion of the collateral may be sold without the secured party's written consent (Pledge Agreement, ¶ 4.3). A sale violating this covenant constitutes an event of default under the Pledge Agreement.

In ¶ 7 of the Pledge Agreement, the secured party is named as pledgor's (Humberson's) proxy with power to vote the Interlink stock upon the occurrence and during the continuation of an event of default. Appended as Exhibit A to the Pledge Agreement is an Irrevocable Stock

---

**1.** DVI is party to cash collateral and financing orders in the cases of Interlink and the Inter-   link subsidiaries.

Power for the benefit of Medcapital Funding I Corporation ("Medcap") signed by Humberson. The Court has been informed, but does not at this time find, that Medcap was a predecessor of HCIF.

Because Humberson did not obtain HCIF's written consent to a sale of his stock to Americare,[2] the Pledge Agreement was in default at the time Intrepid acquired HCIF's loans to Interlink. Following purchase of HCIF's position, Intrepid therefore undertook to exercise its rights as Humberson's proxy under the Pledge Agreement to vote the Interlink stock and elect a new board of directors for Interlink.

After initial sparring with Americare in state court, the directors elected by Intrepid authorized Interlink to file a case under chapter 11 of the Bankruptcy Code, which it did in this Court on July 16, 2002. Americare then filed a motion asking for various forms relief, including dismissal of Interlink's chapter 11 case. Americare took the position that the Pledge Agreement was not valid and therefore Intrepid could not exercise the proxy granted thereby. According to Americare, since Intrepid could not vote Interlink's stock, the directors who authorized the chapter 11 filing had not been properly elected, and the bankruptcy filing was void.

The Court conducted hearings on Americare's motion on July 18 and 19, 2002. During the hearings Humberson initially testified that the signature on the Pledge Agreement was not his. Upon being confronted with the original document, however, he admitted to his signature but testified he had never signed the Pledge Agreement. Although Humberson inferred that the page bearing his signature had been appended to a new document, Americare failed to provide sufficient evidence to overcome the prima facie validity of the Pledge Agreement. Accordingly, by Order entered July 24, 2002 (the "July 24 Order"), premised on findings announced in open court on July 19, 2002, the Court overruled Americare's motion[3] without prejudice to Americare or Intrepid commencing further proceedings to address Intrepid's right to vote Interlink's stock or Americare's ownership of the stock. Since that ruling the parties have maintained or filed the following adversary proceedings in this Court:

1. Complaint No. 02–4196—*Americare Management, Inc. v. Intrepid of Texas, Inc.*

2. Complaint No. 02–4200—*Intrepid of Texas, Inc. v. Americare Management, Inc.*

3. Complaint No. 02–4215—*Interlink Home Health Care Inc. v. Americare Management Inc. and Ronald Lusk*

The parties also pursued litigation in state court. Apparently in part to stop the state court litigation, on August 21, 2002, Phoenix and Americare filed chapter 11 petitions in the District of Delaware. Besides bringing a halt to the state court litigation, the Phoenix and Americare filings stopped pending litigation in this Court. Intrepid and Interlink promptly filed a motion in the bankruptcy court for the District of Delaware pursuant to Fed. R. Bankr.P. 1014(a) (the "Delaware Motion") asking that the Phoenix and Ameri-

---

**2.** In order to sell the stock to Americare, Humberson purportedly executed a lost stock affidavit.

**3.** Because of the unique problems presented by the contest over control, the Court also directed appointment of an examiner to assist in preserving Interlink's going concern value and the status quo ante. William Burke, Esq. (the "Examiner") was thereafter appointed.

care cases be transferred to this district. The Delaware Motion remains pending at this writing.

At an August 23, 2002 status conference, the Court observed that the issue of venue might ultimately be resolved such that the cases of Interlink and the Interlink Subsidiaries would be moved to Delaware.[4] Because of a difference in case law between the Fifth Circuit and the Third Circuit,[5] the Court's statement prompted HHS to withhold payments due to Interlink and the Interlink Subsidiaries. Since this put Interlink's very survival in jeopardy, the Court convened another status conference on August 29, 2002. Following that hearing, perceiving that it was critical to address the venue issues as soon as possible, the Court entered a Memorandum Order (the "August 29 Order") directing that Americare, HHS and Interlink, *inter alia*, would have until 4:00 p.m. on August 30, 2002, to file in this Court any motion pursuant to FED. R. BANKR.P. 1014 regarding the venue of the chapter 11 cases of Interlink, Americare and Phoenix. The Court also set a hearing for September 4, 2002 on any such motions as might be filed.

## II. *Positions of the Parties*

HHS, the Phoenix Debtors, and Interlink filed, respectively, the following papers prior to the September 4, 2002 hearing:

1. Bankruptcy Rule 1014 Motion to Transfer Venue (the "HHS Motion");

2. Response of the Phoenix Group Corporation and Americare Management, Inc. to Motion of Tommy Thompson, Secretary of the United States Department of Health and Human Services, to Transfer Venue and Cross Motion, Pursuant to Bankruptcy Rule 1014(b), for Transfer of Venue of Chapter 11 Cases of Interlink Home Health Care, Inc. *et al*, to the District of Delaware (the "Phoenix Motion"); and

3. Debtors' Response to the Phoenix Group Corporation and Americare Management, Inc.'s Cross–Motion, Pursuant to Bankruptcy Rule 1014(b), for Transfer of Venue of Chapter 11 Cases of Interlink Home Health Care, Inc., *et al.* to the District of Delaware; and Response and Limited Objection to Motion of Tommy Thompson, Secretary of the United States Department of Health and Human Services, to Transfer Venue (the "Interlink Response")

At the September 4, 2002 hearing, the parties all presented argument to the Court, and Interlink provided the testimony of the Examiner and Karen Stevens, one of its Court-approved outside accountants.

### A. *HHS*

By the HHS Motion, HHS asks that this Court transfer the Phoenix and Amer-

---

4. The Court also noted that the Phoenix and Americare cases might be transferred to Texas, or all cases might be administered in the districts of their filing.

5. *Compare In re University Med. Ctr.*, 973 F.2d 1065, 1078 (3d Cir.1992) (concluding that recoupment of Medicare overpayments from different cost years is a violation of the automatic stay), *with, United States Abatement Corp. v. Mobil Exploration and Producing* U.S., Inc. (*In re United States Abatement Corp.*), 79 F.3d 393, 398–400 (5th Cir.1996) (employing broad interpretation of recoupment doctrine). *See also In re AHN Homecare, LLC*, 222 B.R. 804, 811–12 (Bankr. N.D.Tex.1998) (declining to follow Third Circuit's restrictive approach to recoupment of Medicare overpayments, and allowing recoupment of overpayments from prior cost years against current cost year).

icare chapter 11 cases to this district. HHS argues that Americare asserts an affiliate relationship with Interlink (which by extension makes Phoenix an affiliate of Interlink). HHS further argues that, Interlink having filed the first bankruptcy petition, this Court may thus direct, pursuant to FED. R. BANKR. 1014(b), that the Phoenix and Americare cases be transferred from Delaware to Texas. HHS goes on to cite the connections of Interlink and the Interlink Subsidiaries to Texas and argues that it is important that administration of their cases occur here even if Americare ultimately succeeds in regaining control of Interlink.

### B. *Phoenix and Americare*

In the Phoenix Motion, the Phoenix Debtors asked that the Court transfer the cases of Interlink and the Interlink Subsidiaries to Delaware. At the September 4, 2002 hearing, however, the Phoenix Debtors indicated they wished to withdraw that request for relief.[6] Instead, Phoenix and Americare urged the Court to defer any decision to transfer their cases to Texas. They argue the Court should first address the question of who controls Interlink that is, whether Intrepid or Americare is the proper entity to vote the common stock of Interlink. Only after determining that issue should the Court address wheth-

er the Americare and Phoenix cases should be moved.

### C. *Interlink*

Interlink, in the Interlink Response, denies that Americare is its affiliate.[7] Accordingly, it argues that Rule 1014(b) is not applicable. On the other hand, Interlink suggests that the Court invoke 11 U.S.C. § 105 together with Rule 1014(a) to order transfer of the Phoenix and Americare cases to this district or alternatively, that the Court recommend that the Delaware bankruptcy court order such a transfer or "proceed as expeditiously as possible" to rule on the Delaware Motion.

The Interlink Response also argues that, under applicable case law, its venue is proper and most appropriate in this district. At the September 4, 2002 hearing, Interlink's evidence and argument were largely in support of this point.

### III. *Issues*

The Court is presented with three issues it must address:

A. May a bankruptcy court direct another bankruptcy court to transfer to it a case pursuant to FED. R. BANKR.P. 1014(a) and 11 U.S.C. § 105?

B. Does FED. R. BANKR.P. 1014(b) apply in the instant case?

---

6. The Court nevertheless addresses the question of the proper venue for Interlink in Section IV.B.2 below.

7. Both Interlink and the Phoenix Debtors take the position that Americare would not be an affiliate of Interlink even though Americare owns the stock of Interlink unless Americare also can vote that stock. Though the Court in the August 29 Order noted that Intrepid and Americare disputed each other's ownership of the Interlink stock, this was a mischaracterization of the situation. Intrepid and Interlink do not appear to question that Humberson transferred his rights in the stock to Americare (in fact, under the Pledge Agreement, it

is a *sale* as opposed to an *attempted sale* that is an event of default). Thus, contrary to the description of facts in the August 29 Order (but consistent with its oral findings of July 19, 2002 and the July 24 Order), the difference between the parties is limited to Intrepid's right to vote the stock, as Intrepid does not claim to have foreclosed on it. The Court's erroneous statements in the August 29 Order were not relevant to the decretal portions of that order but may have led the parties to mistake the Court's understanding of the issue posed in connection with the Interlink stock.

C. If it has the power to do so, should the Court order the transfer of the Phoenix and Americare cases to this district? [8]

## IV. *Discussion*

Resolution of the issues before the Court depends on the proper interpretation of FED. R. BANKR.P. 1014. Rule 1014 states:

Rule 1014. Dismissal and Change of Venue.

(a) **Dismissal and Transfer of Cases.**

(1) *Cases Filed in Proper District.* If a petition is filed in a proper district, on timely motion of a party in interest, and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, the case may be transferred to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties.

(2) *Cases Filed in Improper District.* If a petition is filed in an improper district, on timely motion of a party in interest and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, the case may be dismissed or transferred to any other district if the court determines that transfer is in the interest of justice or for the convenience of the parties.

(b) **Procedure When Petitions Involving the Same Debtor or Related Debtors Are Filed in Different Courts.** If petitions commencing cases under the Code are filed in different districts by or against (1) the same debtor, or (2) a partnership and one or more of its general partners, or (3) two or more general partners, or (4) a debtor and an affiliate, on motion filed in the district in which the petition filed first is pending and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, the court may determine, in the interest of justice or for the convenience of the parties, the district or districts in which the case or cases should proceed. Except as otherwise ordered by the court in the district in which the petition filed first is pending, the proceedings on the other petitions shall be stayed by the courts in which they have been filed until the determination is made.

Proper application of this rule in the instant case depends upon whether Americare and Interlink are affiliates under 11 U.S.C. § 101(2)(A),[9] which states:

(2) "affiliate" means—

(A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

---

8. Because of the Court's decision, it need not address whether it should recommend that the Delaware court transfer the Phoenix and Americare cases to this district. The Court is distinctly uncomfortable with the concept of recommending a specific course of action to another bankruptcy judge.

9. Section 101(2)(B) is the mirror image of this provision and would be applied identically to show a debtor is an affiliate of its 20% subsidiary.

(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;

If there is not an affiliate relationship, any transfer of venue must be under Rule 1014(a). If there is such a relationship, subdivision (b) of the rule is brought into play.

## A. *Rule 1014(a)*

■ The Court finds no basis in 11 U.S.C. § 105 for arrogating to itself the power to direct another court to transfer a case pursuant to Rule 1014(a). Interlink has cited no cases to support its argument that this Court may so act. The Court has found none, and the Court would be hesitant to follow any (other than controlling) authority that provided it might engage in a potential war of orders with another court over the issue of venue. It is most unlikely, in light of past decisions of the Fifth Circuit, that such a use of section 105 by this Court would be approved on appeal.[10] The Court therefore holds that it may not order transfer of the Phoenix and Americare chapter 11 cases from Delaware to Texas pursuant to Rule 1014(a).

## B. *Rule 1014(b)*

If any change of venue is to occur in the Interlink, Phoenix and Americare cases, it will have to be under the authority of Rule 1014(b).[11] That rule will only apply if In-terlink and Americare are affiliates. If they are not, this Court need proceed no further.

### 1. *Is Americare Interlink's affiliate?*

■ Interlink agrees with Americare and Phoenix that, in order for Americare and Interlink to be affiliates, Americare must have the power to vote the stock of Interlink. They thus read the words "with power to vote" in 11 U.S.C. § 102(2)(A) as modifying the verbs "owns" and "controls" as well as the verb "holds". If this interpretation is correct, then in order to now find an affiliate relationship between Americare and Interlink, the Court would be required to ignore its determination of July 19, 2002 that the Pledge Agreement is prima facie valid and Intrepid is entitled thereunder to vote the stock of Interlink.[12]

The Court believes this is not the correct reading of the section. Rather, § 101(2)(A) poses three conditions upon which affiliation may be premised: (1) ownership of 20% or more of debtor's voting securities; (2) control of 20% or more of debtor's voting securities; or (3) the holding of 20% or more of debtor's voting securities *if* the holder has the power to vote the securities. In the case of ownership or control, the power to vote the securities is unnecessary to establish an affiliate relationship.[13]

---

**10.** *See e.g. In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir.1993). *See also United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986) (section 105(a) does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity); *In re Texas Consumer Finance Corp.*, 480 F.2d 1261, 1265 (5th Cir. 1973) (powers granted by predecessor of section 105(a) must be exercised in manner consistent with title 11).

**11.** The Court does have authority to order transfer of the Interlink case (and those of the Interlink Subsidiaries) to Delaware under Rule 1014(a), but no party seeks that relief.

**12.** HHS suggests that the Court could rely on the *assertion* of an affiliate relationship with Interlink by Americare. This, however, would still require pretending the prior ruling on Americare's motion to dismiss did not occur. To do so would amount to the sort of legal legerdemain by which litigants seek to have their cake and eat it too.

**13.** HHS, unlike Interlink, Phoenix and Americare, concurs with this reading of the statute.

### a. *Plain Meaning of § 101(2)(A)*

■ The Supreme Court has repeatedly adjured that the first step in construing the Bankruptcy Code is to look to the plain meaning of the provision in question.[14] In the instant case, the Court considers it significant that there is a comma following the word "controls", but none preceding the words "with power to vote." Had Congress intended the latter clause to apply to an entity that owned or controlled voting securities, such a comma would have been inserted. The Supreme Court, interpreting an identical grammatical construction in 11 U.S.C. § 506(b), concluded that the initial comma demonstrated a clear intent to separate the first noun clause (in that case "interest on such claim") from the modifier ("provided for under the agreement").[15] The absence of a comma between the second noun clause ("any reasonable fees, costs, or charges") required that the latter be read together with the modifier.[16] In § 101(2)(A), comparable punctuation dictates that the clause "with power to vote" applies only to the verb "holds".

Construction of other definitions confirms this conclusion. Thus in the definition of "attorney" in § 101(4),[17] the phrase "authorized under applicable law to practice law" is set off from the term "partnership" to make it applicable to the other types of entity listed in the section.[18] See also the definition of "indenture" in § 101(23).[19]

### b. *Origins of § 101(2)(A)*

A review of the origins of § 101(2) is also helpful. The Bankruptcy Code's definition of "affiliate" first appears in the Commission on Bankruptcy Laws of the United States (the "Commission Report"). The definition of "affiliate" given in the Commission Report is an adaptation of former bankruptcy rule 901(3), adopted for use with the Bankruptcy Act.[20] Rule 901(3), which is virtually identical to § 101(2)(A), was, in turn, derived from the definitions of "subsidiary company" and "affiliate" under the Public Utility Holding Company Act of 1935 ("PUHCA")[21] and

---

**14.** *See e.g. Union Bank v. Wolas,* 502 U.S. 151, 161–62, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991) (holding that the fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to the statute's plain meaning); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (task of resolving dispute over meaning of section 506(b) began where all such inquiries must begin: with the language of the statute itself).

**15.** In *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the relevant portion of section 506(b) was: "[T]here shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose."

**16.** *See Ron Pair,* 489 U.S. at 242–43, 109 S.Ct. at 1030–31.

**17.** Section 101(4) reads: " 'attorney' means attorney, professional law association, corporation, or partnership, authorized under applicable law to practice law."

**18.** *See e.g. In re Desilets,* 291 F.3d 925, 927 (6th Cir.2002) (applying "authorized under applicable law to practice law" to "attorney" for purposes of § 101(4)).

**19.** *But see also* § 101(6) ("as defined in Section 761 of this title" applying only to "commodity options dealer") and § 101(24) ("in a foreign proceeding" apparently modifying "trustee", "administrator" and "other representative of an estate", despite not being set off by commas).

**20.** H.R. Doc. No. 93–137, pt. 4, at 580 n. 4 (1973).

**21.** *See* Id. *See also* 2 COLLIER ON BANKRUPTCY ¶ 101.02 (15th ed. rev. 2002). Cases found by the Court interpreting PUHCA's definitions of

the definition of "subsidiary" in § 106(13) of the former Bankruptcy Act.

Section 106(13) of the Bankruptcy Act, when read in connection with former rule 901(3), provides some indication of what the rule's drafters intended to accomplish. Section 106(13) defines a "subsidiary" as a corporation "the majority of whose stock having power to vote is owned ... by [a debtor]." This language clearly indicates that the operative requirement is *ownership* of the voting stock, not the actual ability to vote the stock. Former bankruptcy rule 901(3) reads: "Affiliate ... means ... (B) a person who directly or indirectly owns, controls, or holds with power to vote, 25 percent or more of the outstanding voting securities of the bankrupt ...."

When viewed in the context of the issue at bar, the interplay of the definitions of "subsidiary" and "affiliate" is instructive. Here, Americare owns 100% of the voting stock of Interlink and would be Interlink's parent for purposes of section 106(13). On the other hand, because of the Pledge Agreement, Americare does not have the power to vote the stock of Interlink, and, as a result, would not be an affiliate of Interlink under rule 901(3) if the Court were to adopt the interpretation advocated by Interlink, Americare and Phoenix. It is most unlikely that the drafters of rule 901(3) intended that the parent of a 100% owned subsidiary (within the meaning of section 106(13)) would not be an affiliate (within the meaning of rule 901(3)) of that same subsidiary even if the parent had pledged the stock to its lender and the lender thereafter exercised the parent's

power to vote; rather the parent-subsidiary relationship was intended to be that of affiliates under the rule. As rule 901(3) is the source of the Bankruptcy Code definition of "affiliate", the same interpretation should be given to section 101(2). This conforms to the discussion below of an owner being an affiliate even if deprived of voting rights.

In explaining the origin of the Bankruptcy Code's definition of affiliate, the Commission Report also refers to the definition of "control" used in the Investment Company Act of 1940 (the "ICA").[22] The ICA defines "control" as the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company.[23] Importantly, the definition of "control" cited to favorably in the Commission Report does not require "a power to vote" for a party to be deemed in control. This also weighs in favor of a reading of section 101(2) of the Bankruptcy Code that limits "with a power to vote" to "hold" only.

c. *Logical Implications of Construction of § 101(2)(A)*

The construction proposed by Interlink, Phoenix and Americare would lead to illogical results. To require that the "power to vote" be coupled with ownership or control in order for an entity to meet the definition would render use of the words "directly or indirectly" in § 101(2)(A) a virtual nullity, since it is unlikely that an indirect owner or controller of securities would have the power to vote them.[24] An owner

---

"subsidiary company" or "affiliate" neither support nor undermine the Court's interpretation of section 101(2) of the Bankruptcy Code.

**22.** 15 U.S.C. § 80a–2(9).

**23.** The ICA then goes on to set out certain presumptions about control based on ownership of voting securities.

**24.** The only court to have construed section 101(2)(A) adopted the same interpretation as does this Court for this reason, noting that

whose stock is subject to a voting trust or which is the parent of a parent (e.g., Phoenix), would not satisfy the definition of an affiliate. Yet it is certain that the term "affiliate" was intended to be broad enough to include a parent of a parent, even though its immediate subsidiary, not it, would have the legal power to vote the debtor's stock.

Moreover, that the entity that owns a debtor's stock happens to lose or surrender the power to vote the stock (while retaining ownership) should not change that entity's status as an affiliate.[25] Besides excluding from the definition of affiliate the beneficial owner of 20% of a debtor's voting stock, ascribing such a result to the transfer of voting power would invite manipulation of bankruptcy powers, not only in the area of venue, but also in other contexts, such as recovery of insider preferences.

### d. *Application to the Instant Case.*

Based on the preceding analysis, the Court concludes that an entity that owns 20% or more of the voting securities of a chapter 11 debtor is an affiliate of the debtor, whether or not it has the power to vote those securities. In the case at bar, there is no dispute that Humberson sold his stock to Americare. The issue rather is whether Americare or Intrepid is the proper entity to vote the stock. On these facts the Court must hold that Americare is an affiliate of Interlink. FED. R. BANKR.P. 1014(b) therefore is applicable in this case,[26] and the Court must determine whether the chapter 11 cases of Phoenix and Americare should be transferred to this district.

### 2. *Should the Court Order a Transfer of Venue in the Instant Case?*

■ In determining whether the Phoenix and Americare cases should be transferred to this district, the inquiry runs to whether that transfer will serve "the interest of justice or . . . the convenience of the parties."[27] This inquiry must focus principally upon the Phoenix and Americare cases, not the Interlink case. The Court may, however, take into account the effect on administration of the cases of Interlink and the Interlink Subsidiaries in deciding between the alternatives of leaving the Phoenix and Americare cases pending in Delaware (subject to the Delaware Motion) or directing their transfer for administration in this Court. Moreover, the propriety of maintaining venue in Texas for Interlink and the Interlink Subsidiaries is relevant because, if Interlink's stock (and so its management) is ultimately determined to be under the control of Americare, a new move to administer Interlink and its upstream affiliates in the same court is likely to be undertaken.

"control" must describe a condition different from holding "with a power to vote". *In re Elephant Bar Restaurant, Inc.*, 196 B.R. 747, 29 B.C.D. 228, 231 (Bankr.W.D.Pa.1996).

**25.** And thereby a basis for insider status. If a parent which executes a proxy ceases upon forfeiting voting power to be an affiliate of its subsidiary, the principal basis for its insider status would disappear as well. 11 U.S.C. § 101(31)(B) and (E).

**26.** Americare and Phoenix intimated that, as they have withdrawn their motion under Rule 1014(b) and as the motion by HHS has not been vigorously prosecuted and is premised on dubious grounds, the Court is not able to or should not invoke that rule. Even if the Phoenix Motion has been effectively withdrawn, the Court believes the HHS Motion is sufficient. Moreover, the Court arguably could invoke Rule 1014(b) on its own motion. *See e.g.* 9 COLLIER ON BANKRUPTCY ¶ 1014.02[2][b] (15th ed. rev.2002) (discussing a bankruptcy court's ability to invoke Rule 1014(a) *sua sponte* through section 105(a)).

**27.** FED. R. BANKR.P. 1014(b).

The Court, therefore, considers relevant to the question before it the evidence presented by Interlink on September 4, 2002. This evidence showed that (1) most creditors of Interlink and the Interlink Subsidiaries are located in Texas;[28] (2) Interlink maintains its principal places of business in Texas in close proximity to the Court; (3) a majority of the witnesses likely to be necessary to the Interlink case are located near this Court;[29] (4) the assets and businesses of Interlink center on Texas; (5) the administration of the Interlink and Interlink Subsidiary cases will be more economical here than in Delaware. The Court has considerable experience with Interlink, having addressed the stock issue, entered orders respecting use of cash collateral and financing, appointed an examiner, considered the relations between HHS and Interlink, and addressed a number of operational and administrative questions. Under the tests adopted in *Matter of Commonwealth Oil Refining Co., Inc.*, 596 F.2d 1239, 1247 (5th Cir.1979), *cert. den.* 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980) and its progeny (*e.g. In Re Moss*, 249 B.R. 411 (Bankr.N.D. Tex. 2000) and *In re the Consolidated Companies*, 113 B.R. 269 (Bankr.N.D. Tex. 1989)), there can be no question that this Court is the proper—perhaps the only logical—venue for the chapter 11 cases of Interlink and the Interlink Subsidiaries.

Because the Interlink cases are best kept in the Northern District of Texas, the Court must consider the effect on efficiency of administration of these cases in its decision respecting Phoenix and Americare. To the extent administration of the Phoenix and Americare cases in Delaware would adversely affect proceedings in this Court, the resulting prejudice to Interlink, the Interlink Subsidiaries and their creditors must be balanced against any inconvenience or prejudice that might be suffered by Phoenix, Americare and their creditors if those cases are transferred to this district.

a. *Consideration of Commonwealth Oil Factors with Respect to Phoenix Debtors*

■ In determining whether the Phoenix and Americare cases should be transferred to this district, the same factors are relevant as were considered by the Fifth Circuit in deciding the Commonwealth Oil case.[30] Thus, location of the Texas and Delaware forums vis-à-vis (1) creditors, (2) the debtors, (3) witnesses and (4) assets must be considered as well as the efficient administration of the Phoenix and Americare estates and the necessity for ancillary administration given venue in either forum.[31] The Court has determined facts relevant to this examination from the statements of counsel for the Phoenix Debtors and from documents available at the Delaware bankruptcy court's website.

Though incorporated in Delaware, Phoenix, like Americare, has its principal place

---

**28.** As noted by the court in *In re Enron Corp., et al.* (Bankr.S.D.N.Y. Case No. 01–16034(AJG)), the convenience of the forum is as significant as the location of creditors. Fort Worth, halfway between the east and west coasts, served by Dallas/Fort Worth Airport and at or near the hub of four interstate highways, certainly is one of the most accessible cities in the United States.

**29.** In fact, in proceedings in the Interlink case, Americare has been an active partici-

pant, easily able to produce its witnesses, most of whom live within easy driving range of this Court.

**30.** *See e.g. In re Moss*, 249 B.R. 411, 425 (Bankr.N.D.Tex.2000); *In re Consolidated Companies*, 113 B.R. 269, 274 (Bankr. N.D.Tex.1989); *In re Pope Vineyards*, 90 B.R. 252, 255 (Bankr.S.D.Tex.1988).

**31.** *Commonwealth Oil*, 596 F.2d at 1247.

of business in Dallas. Of its 20 largest creditors, Phoenix lists seven from Texas (more than any other state; no creditor on the twenty largest list is from Delaware). Americare lists only Interlink as a creditor. As discussed above, Americare has had no problem producing witnesses in Fort Worth, and the Court infers the convenience for witnesses would be as well served by administration in the Fort Worth bankruptcy court as in Delaware. Counsel has represented to the Court that Americare and Phoenix are holding companies with no direct operations. Thus far, nothing has occurred in the Delaware bankruptcy court that would complicate transfer of the two cases to Texas.

On the other hand, the Americare case, at least, is intertwined with the Interlink case. Besides the issue of voting control of Interlink's stock, Interlink has commenced a voidable transfer action against Americare and alleges that Americare has "stolen" employees and patients from it (an allegation supported by the Examiner). If Americare's case remains in Delaware, resolution of these issues will necessarily be in a forum remote from that in which one contestant's case is pending—leading, as a practical matter, to proceedings ancillary to either Americare or Interlink's chapter 11 case. In sum, factors dependent on proximity favor transfer to this district. As to efficient administration of the Phoenix and Americare cases, the lack of activity in Delaware suggests little will be lost by their removal from that district. The presence of so many interested parties in Texas surely supports this district as a proper venue. The Court concludes the cases of the Phoenix Debtors cases will not be adversely affected by a transfer to Texas. Indeed, there is obvious advantage to having all cases and adversary proceedings pending in the same court.

### b. *Effect on Interlink*

As this Court indicated in the August 29 Order, the inconvenience of litigating in another forum is a minor factor in the venue decision. In the case at bar, however, the disputes between Americare and Interlink affect the very operation of Interlink's business. The subsidiaries of the two entities compete in at least some geographical areas with one another for patients, independent providers and employees.

The filing in Delaware by Phoenix and Americare has already delayed this Court in addressing the question of who has voting control of Interlink's stock. If the Phoenix and Americare cases remain in Delaware, filings by operating subsidiaries could follow, compromising this Court's ability to protect Interlink's going-concern value. This, in turn, could impair Interlink's reorganization. Considering that Phoenix and Americare are holding companies, and considering how little has occurred in their Delaware cases, there can be no doubt that the potential impact on Interlink of those cases remaining in Delaware weighs in favor of their transfer to Texas.

### c. *Arguments of Phoenix and Americare*

Phoenix and Americare make four arguments in favor of the Delaware venue. In the Phoenix Motion, they suggest their creditors would prefer their cases to proceed in Delaware, but the Court has been presented with no evidence of this preference. They point to the deference that should be given to a debtor's choice of venue, but that would seem to matter little when a court is dealing with holding companies without active business operations. The Phoenix Motion also argues (primarily with regard to Interlink's venue) that the law of the Third Circuit may provide ad-

vantages as opposed to that of the Fifth Circuit (see footnote 5 above). Even assuming it is appropriate for this Court to decide a venue issue on the premise that a debtor should not be burdened by case law binding in this district, it does not appear that any advantage would accrue to Phoenix or Americare by reason of Third Circuit law in this area.

Finally, Phoenix and Americare note they have retained professionals closer to Delaware than Texas. Yet Americare has been ably represented in the Interlink case by two firms in Texas. Moreover, Phoenix clearly is familiar with lawyers in the Dallas–Fort Worth area, as three of its 20 largest creditors are law firms with major presences here. Finally, as noted above, Fort Worth is easily accessible perhaps more so than Wilmington. Present bankruptcy counsel for Phoenix and Americare would find it easy to travel to this Court and may be certain of receiving a warm welcome.

Phoenix and Americare argued on September 4, 2002 that determination of the venue issue should be deferred until the Court decides whether Intrepid or Americare should vote the Interlink stock. While that suggestion has surface appeal, it simply is not practical. Proceedings in Texas could be affected by further filings in Delaware, and the issue of venue, for the sake of all parties, is better set to rest now than later.

### V. *Conclusion and Order*

For the foregoing reasons, the Court concludes that the interest of justice and convenience of the parties are best served by administration of the Interlink, Phoenix and Americare cases in the same court. Given the nature of the debtors, the location of their businesses and the stage of proceedings, that court should be the bankruptcy court for the Northern District of Texas. It is, therefore,

ORDERED that the Phoenix Motion is DENIED; and it is further

ORDERED that the relief sought in the Interlink Response is DENIED; and it is further

ORDERED that the HHS Motion is GRANTED; and it is further

ORDERED that venue of the Americare Management, Inc., and The Phoenix Group Corporation chapter 11 cases is transferred from the District of Delaware to the Northern District of Texas, effective as of the entry of this Order.